The First Circuit addressed the purpose of anti-dilution statutes as follows:

> A trademark is tarnished when consumer capacity to associate it with the appropriate products or services has been diminished. The threat of tarnishment arises when the goodwill and reputation of a plaintiff's trademark is linked to products which are of shoddy quality or which conjure associations that clash with the associations generated by the owner's lawful use of the mark.

*L.L. Bean*, 811 F.2d at 31. The First Circuit concluded that "neither the strictures of the first amendment nor the history and theory of anti-dilution law permit a finding of tarnishment based solely on the presence of an unwholesome or negative context in which a trademark is used without authorization." *Id.*

This Court has previously concluded that Defendants' use of Plaintiff's marks does not create a likelihood of confusion in the marketplace. Thus, Plaintiff's attempt to use that test to prove its allegations of dilution must fail. Moreover, because Defendants' use of Plaintiff's marks occurred in an editorial context, there is no threat of tarnishment through association with shoddy or disharmonious products. Accordingly, the Court will enter judgment for Defendants on Plaintiff's state law anti-dilution claim.

IT IS HEREBY ORDERED that Plaintiff's claims for relief are DISMISSED with prejudice.

LUTHERAN MEDICAL CENTER OF OMAHA, NEBRASKA, d/b/a Lutheran General Hospital and Richard H. Young Memorial Hospital, a not-for-profit Nebraska corporation, and William H. Henderson, M.D., Plaintiffs,

v.

CONTRACTORS, LABORERS, TEAMSTERS AND ENGINEERS HEALTH AND WELFARE PLAN, Defendant.

No. CV89-0-715.

United States District Court, D. Nebraska.

Feb. 18, 1993.

Steven D. Davidson, Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, Omaha, NE, for plaintiffs.

M.H. Weinberg, Weinberg & Weinberg, Omaha, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter comes on to consider Plaintiffs' Application for Attorney Fees, (Filing 127), and supplemental application, and Defendant's Response to Application for Attorney Fees (Filing 130). I shall grant Plaintiffs' applications, but I shall reduce the amount requested by $5,188.51, and grant a

total award of attorney fees in the amount of $49,299.69.[1]

## I.

Following a five-day nonjury trial, I entered findings of fact and conclusions of law, (Filing 123), that Defendant had acted arbitrarily and capriciously in denying Plaintiffs' claim for benefits, thereby violating the Employee Retirement Income Security Act (ERISA) of 1974, 29 U.S.C. §§ 1001–1461 (1988). I found that the plaintiffs—a hospital and a doctor—were entitled to recover from Defendant virtually all of their charges—$66,000.27, together with costs and prejudgment interest.

I specifically found that the injury or sickness for which Mrs. Rodriguez (the spouse of the Plan participant who had assigned benefits to Plaintiffs) was treated during each of her three hospitalizations was not an injury or sickness resulting from any attempt at suicide or from any intentionally self-inflicted injury. Thus, the Plan provisions excluding such charges were inapplicable.

Furthermore, I found that until suit was filed the only reason given for denial of Mrs. Rodriguez' claim was based on an exclusion having to do with suicide. I found that after suit was filed Defendant asserted various other pretextual grounds for denying the claim which were designed to insulate Defendant from its prior erroneous claims determination that coverage did not exist.

I also specifically found that Defendant's acts were arbitrary and capricious for, among other reasons, each and all of the following:

1. Defendant's reading of the policy language was unreasonable and internally inconsistent;

2. Defendant relied upon improper and extraneous information in denying the claim;

3. Defendant waited until after suit was filed before endeavoring to develop all relevant information about the claim;

4. Defendant treated a similar claim inconsistently;

5. If Defendant truly had a room limit of $190.00 per day, that limit was imposed without notice and substantially contradicted the 1985 summary Plan description, thereby conflicting with the policies of ERISA.

As a result, Plaintiffs filed an "Application for Attorney Fees," (Filing 127), seeking to recover fees of $51,260.56[2] and expenses of $2,603.09. Plaintiffs then supplemented their fee application, requesting additional fees of $624.55 based upon work related to the fee question. Attorney fees sought are now $51,885.11, together with expenses of $2,603.09, for a total award of $54,488.20.

Plaintiffs' counsel claims to have spent approximately 676 hours[3] preparing and trying this matter. The bench trial in this case lasted about five days, and approximately 130 exhibits were offered and received. Approximately nine witnesses were called to testify, including three experts.

Defendant submitted its "Response to Application for Attorney Fees," (Filing 130), asserting that I should not allow attorney fees in this case but that if I did allow such fees, they should be limited to "the generally accepted charging practices of the legal community."

## II.

There are two issues to be decided. First, I must determine whether, in the exercise of my discretion, I should award attorney fees

---

1. This includes attorney fees of $46,696.60 and expenses of $2,603.09. To the extent that the expenses are duplicated in the bill of costs, Plaintiffs are not entitled to recover for expenses twice and shall refund any overpayment to Defendant.

2. There is a discrepancy between the application and the supporting affidavit. The application requests fees of $51,260.56, (Filing 127, at 2), whereas the supporting affidavit requests fees of $53,084.21 (Filing 129, at 3). Expenses remained the same in both documents. I resolved the discrepancy by using the amount requested in the application.

3. There is a discrepancy between the application and the supporting affidavit of approximately 18.67 hours. I used the smaller number set forth in the application.

pursuant to 29 U.S.C. § 1132(g) (ERISA gives the court discretion to "allow a reasonable attorney's fee and costs of action to either party."). If the answer to this question is in the affirmative, I must then determine the appropriate amount of attorney fees.

### A.

 Given the remedial purposes underlying ERISA, the United States Court of Appeals for the Eighth Circuit has indicated that a plan beneficiary successfully seeking to enforce rights under an ERISA plan "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Landro v. Glendenning Motorways*, 625 F.2d 1344, 1356 (8th Cir.1980) (quoting *Newman v. Piggie Park Enters.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)). *See also Gunderson v. W.R. Grace & Co. Long–Term Disability Income Plan*, 874 F.2d 496, 500 (8th Cir.1989). The burden of demonstrating the "special circumstances" necessary to overcome the presumption in favor of an award of fees to a prevailing ERISA beneficiary rests upon the losing party. *Landro* at 1356 n. 19; *Gunderson* at 500.

 As I endeavor to exercise my discretion, I must consider the following factors:

1. The degree of the opposing party's culpability or bad faith;
2. The ability of the opposing party to satisfy an award of attorney fees;
3. Whether an award of attorney fees against the opposing party could deter other persons acting under similar circumstances;
4. Whether the parties requesting attorney fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself;
5. The relative merits of the parties' positions.

*Jacobs v. Pickands Mather & Co.*, 933 F.2d 652, 659 (8th Cir.1991) (citing *Lawrence v. Westerhaus*, 749 F.2d 494, 495 (8th Cir.1984) (quoting *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255 (5th Cir.1980))).

 With the foregoing in mind, I turn to the five-factor analysis I must undertake in order to prudently exercise my discretion.

#### 1. Culpability

Defendant's culpability in this case is significant. I found that Defendant's claims decision was arbitrary and capricious in substance and not supported by the language of the Plan. Moreover, I found that numerous defenses and other grounds for denial raised after suit was filed were a "pretext" designed to protect Defendant from its prior ill-advised decision to deny the claim.

Defendant's treatment of a similar claim illustrates my finding that it acted in substantial bad faith in this matter. I refer to the so-called Doe claim. (Exs. 30–35.) Defendant was advised by its lawyers to apply the Plan to the Doe claim in a manner similar to the position later advanced by Mrs. Rodriguez, particularly with regard to the amount of benefits payable for inpatient treatment. (Ex. 35.) The Plan did so. Yet Defendant treated Mrs. Rodriguez very differently after the Doe claim, despite the fact, and I so found, that the Doe and Rodriguez claims were substantially similar.

#### 2. Ability to Pay

Evidence was presented at trial suggesting that Defendant has incurred losses over the last few years, but the evidence also established that appropriate steps have been taken (pursuant to the advice of a retained expert) to assure the continued solvency of the fund.

Defendant submitted the affidavit of Robert Foy, (Filing 130, Ex. B), benefits administrator for the Plan. In pertinent part, Mr. Foy's affidavit states that the Plan lost approximately $684,000 over the last five years. However, the affidavit provides little or no information about the assets and liabilities of the Plan, or its cash flow.

Mr. Foy speculates:

[t]hat if the Court requires payment of approximately $66,000.00 plus prejudgment interest plus costs plus approximately $56,000.00 of attorneys fees, **then considering the interpretation of the Court**

as to the room rate reimbursement, the health and welfare fund would be in serious danger of being unable to meet its financial obligations on a continuing basis.

(Filing 130, Ex. B, ¶ 16 (emphasis added).)

Mr. Foy's affidavit is, to be charitable, cryptic. He apparently has reference to my holding regarding the $190.00–per–day room limit. While I held that the $190.00–per–day limit was not enforceable as far as Mrs. Rodriguez was concerned, I do not understand how this holding jeopardizes the Plan, and Mr. Foy does not explain it to me. Indeed, the evidence is to the contrary.

For example, Mr. Foy acknowledges that since July 5, 1990, Defendant has not provided benefits to Plan participants for mental and nervous disorders. Thus, it would seem that the Plan would incur no liability from and after the date of the Plan amendment deleting coverage for mental health problems, assuming, of course, that ERISA was otherwise complied with. It would appear, then, that Defendant's exposure regarding the $190.00–per–day room limit would be for very old claims. If that is true, there is a good chance the statute of limitations has run. See R. Cooke, ERISA Practice and Procedure § 8.16 (1992) (suggesting that most courts have applied the most analogous state statute of limitations, and further suggesting that accrual of the cause of action begins on the date of denial of benefits). Although it is not entirely clear, it appears Nebraska has a three-year statute of limitations that is analogous to the cause of action asserted here. Neb.Rev.Stat. § 44–710.-03[11] (1992 Cum.Supp.). Therefore, it is quite unlikely that resolution of this case threatens Defendant's solvency because it is quite probable the statute of limitations will protect Defendant.

In summary, Defendant has made no showing that it does not have sufficient funds to pay the requested fee award or that payment of the award would cause financial hardship. While it is true Defendant has suffered losses in the past, it is also true, as Mr. Foy admits, that Defendant presently has reserves of "15.3 months." (Filing 130, Ex. B, ¶ 9.) I think it fair to assume that with reserves exceeding one year's claims, Defendant has the ability to pay the fees requested, together with the judgment, without substantial hardship. Mr. Foy's speculation, provided without any explanation of its basis, is simply not a reason to deny fees.

### 3. Deterrence Value

An award of fees in this case would have some deterrence value. In particular, such an award would encourage Defendant, and other similar plans, to conduct appeals of claim denials in accordance with plan requirements and especially to refrain from relying upon untimely and pretextual defenses.

### 4. Benefit to Others

This case probably will have little effect on other Plan participants. Moreover, there is nothing legally significant about this lawsuit. All in all, this case is not likely to benefit all participants and beneficiaries, nor is it likely to resolve significant legal questions regarding ERISA.

### 5. Relative Merits

The fifth and final factor has to do with the relative merits of each party's position. Like the first factor, this fifth factor weighs heavily in favor of Plaintiffs. I ruled in Plaintiffs' favor on virtually every disputed matter, with the exception that I did not award some $600.00 in deductible and coinsurance charges which were never the subject of discovery and which Plaintiffs acknowledged on the first day of trial they were not entitled to recover. There was very little justification for the position taken by Defendant in this case.

I pause to note one of defense counsel's arguments. Mr. Weinberg states that due to the untimely death of his father on July 4, 1989, he was not able to be present at the trust meeting on July 21, 1989. Mr. Weinberg states that his father had previously represented Defendant. I take it that I am to infer from this information that had Mr. Weinberg or his father been present at the meeting, Defendant's decision might have been substantially different. However, I do not believe this is a good reason to excuse Defendant's actions. Up to and including the

date of trial of this case, Defendant continued to maintain its initial position. Therefore, I am not persuaded that the absence of counsel made a difference.

### 6. Summary

With the exception of the fourth factor, all of the other factors weigh in favor of awarding attorney fees. Accordingly, I shall award fees to Plaintiffs.[4]

### B.

■ Having determined that attorney fees should be awarded in this case, I must now determine the amount of fees to be awarded. Most courts utilize the twelve-factor test enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). See R. Cooke, ERISA Practice and Procedure § 8.10, at 8–38. In trying to determine what constitutes a reasonable fee award under ERISA, many courts analogize to cases in the civil rights context. *See Jacobs*, 933 F.2d at 659 (citing *Hensley v. Eckert*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983)). In this regard, the cases indicate it is perfectly appropriate to apply current, rather than historic, hourly rates. *Missouri v. Jenkins*, 491 U.S. 274, 283–84, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989). Insofar as paralegals and law clerks are concerned, compensation for the cost of such personnel at market rates is appropriate if that is the practice in the marketplace. *Id.* at 284–88, 109 S.Ct. at 2469–71. And, generally speaking, "out-of-pocket" expenses customarily charged fee-paying clients in the relevant economic market are proper components of any attorney fee award. *Ramos v. Lamm*, 713 F.2d 546, 559 (10th Cir.1983).

With these facts in mind, I turn to the twelve-factor analysis enumerated in *Johnson*.

### 1. Time and Labor Involved

■ Plaintiffs request compensation for a total of approximately 676 hours. This total represents services rendered by seven attorneys, two law clerks, a professional librarian, and two paralegals. The vast majority of time on this case was expended by Plaintiffs' lead counsel, Steven D. Davidson of the law firm of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim. Mr. Davidson was supervised by Jonathan R. Breuning, a partner in the firm. Compensation is requested at the "standard hourly rates" charged for services of each individual at the time the service was rendered, including hourly rates of $75–$95 for Mr. Davidson, and $130–$145 for Mr. Breuning. More than seven thousand dollars in fees were written off by the firm because of the relative inexperience of certain individuals who did research.

I believe the hours and labor expended on this case were reasonable. Preparation of this case included twelve disputed motions, nineteen depositions, ten discovery requests, and three expert witnesses. In order to adequately prepare this case, counsel was required to review extensive medical documentation, including a substantial claim file generated by Defendant and a substantial volume of other claim files, resulting in the identification of a prior similar claim which Defendant had treated differently. Extensive briefing, including a lengthy trial brief addressing each of the numerous issues

---

4. I suppose it could be argued that Plaintiffs are not participants or beneficiaries within the meaning of ERISA § 502(g)(1). However, I believe Plaintiffs stand in the shoes of Mr. and Mrs. Rodriguez, respectively the Plan participant and Plan beneficiary. *See Herman Hosp. v. MEBA Medical & Benefits Plan*, 845 F.2d 1286, 1287–90 (5th Cir.1988) (ERISA health care benefits are assignable to health care providers by beneficiaries; statute contains no anti-assignment provisions with regard to health care benefits, nor is there any language in the statute which even remotely suggests that such assignments are proscribed). It would be unjust to deny Plaintiffs attorney fees in this case, particularly given my finding that Defendant acted arbitrarily and capriciously. It is doubtful that Plan participants

and beneficiaries like Mr. and Mrs. Rodriguez would have the economic wherewithal to initiate and maintain litigation of this kind unless assignments to health care providers are allowed. If attorney fees are not allowed, it is questionable whether or not health care providers would accept assignments. This in turn would require plan participants and beneficiaries to litigate against well-financed defendants or acquiesce in wrongful denial of claims. By allowing health care providers to recover attorney fees, the goals of ERISA are furthered by ensuring that both plan participants and beneficiaries have an alternative to expensive litigation to insulate them from liability on claims that should rightfully have been paid by defendants such as the one here.

raised by Defendant, was submitted. Briefing exceeded one hundred pages. Trial of this matter took five days and involved numerous exhibits and witnesses.

### 2. Novelty and Difficulty

This case did not present any novel issues. However, Defendant complicated the matter by asserting numerous defenses which were, in my judgment, pretextual. For example, Plaintiffs' trial brief had to be substantially longer than necessary in order to address the many defenses raised by Defendant. Otherwise, this was a fairly straightforward and ordinary ERISA case.

### 3. Skill Required

The skill required of counsel in this case was that of an experienced trial lawyer, but no extraordinary skill was required.

### 4. Preclusion of Other Employment

Aside from the hours expended, this case did not otherwise preclude counsel from taking other employment.

### 5. Customary Fee

ERISA cases of this kind are normally billed on an hourly basis. The affidavit of Gerald R. Friedrichsen, (Filing 128, ¶ 6), a competitor of Plaintiffs' counsel, states that the prevailing· hourly rate for most federal court litigation in Omaha, Nebraska, ranges from $90–$150 per hour, depending upon the experience of the individual attorney. Mr. Friedrichsen's affidavit also indicates that it is standard practice in Omaha, Nebraska, to charge fee-paying clients for time expended by law clerks and paralegals at rates comparable to those charged by Plaintiffs' counsel. (*Id.*, ¶ 7.) Furthermore, Mr. Friedrichsen states that it is standard practice for law firms in Omaha, Nebraska, to charge fee-paying clients for the costs of travel, long-distance telephone calls, facsimile transmissions, photocopying, delivery services, computerized legal research, and copying of medical records, in addition to attorney fees. (*Id.*, ¶ 8.)

Mr. Friedrichsen, a litigation partner at a competing law firm in Omaha, Nebraska, comparable in size to the firm engaged as Plaintiffs' counsel, is an experienced attorney. He received his law degree *cum laude* from Creighton University School of Law in 1977. (*Id.*, ¶ 3.) While employed at the Creighton law school, he served as editor-in-chief of the Creighton Law Review. (*Id.*) Thereafter, he clerked for a judge on the Minnesota Supreme Court and for the Honorable Donald P. Lay, Judge of the United States Court of Appeals for the Eighth Circuit. (*Id.*) I find Mr. Friedrichsen's affidavit credible and persuasive.

I also note that in civil rights cases, which, as previously indicated, may serve as appropriate comparisons, this court customarily approves hourly rates ranging from $85–$105 per hour. *See, e.g., Whitnack v. Douglas County,* No. 89–0–740 (Kopf, J., Mem. & Order of 11/13/92); *Smith v. Casmer,* No. 89–0–194 (Kopf, J., Mem. & Order of 3/27/91), slip op. at 8–13 and 15–17. Still further, a Nebraska Bar Association survey conducted in 1989 indicated that nearly 50 percent of the lawyers responding from Omaha, Nebraska, billed at a rate in excess of $90.00 per hour for all types of work. *Smith v. Casmer,* No. 89–0–194, slip op. at 16.

The amount I have awarded produces an average hourly rate of about $69.00 for all professional employees of the firm.[5] If I calculate an effective rate based upon the amount of fees awarded, but on only the number of hours billed by licensed attorneys, the effective hourly rate is about $82.00 per hour.[6] The effective rate awarded is clearly within reasonable norms for litigation of this type.

---

**5.** The rate is determined by dividing $46,696.60 by 676 hours. The lawyers billed approximately 572 hours. The nonlawyers billed approximately 104 hours. The rates for the law firm's nonprofessional employees, including paralegals, librarians, and law clerks, were between $60–$65 an hour. These are customary charges in the relevant economic market. It should be noted that Plaintiffs' counsel "wrote off" more than $7,000.00 in fees. The calculation in the text is after the "write-off," so Defendant is given the benefit of the "write-off" in terms of a reduction of the gross amount claimed. However, the calculation does take into account the total hours billed.

**6.** The rate is determined by dividing $46,696.60 by 572 hours.

### 6. Fixed or Contingent Fee

■ The fee charged in this case was based upon a fee arrangement whereby Plaintiffs' law firm billed at an hourly rate. There was no contingent-fee arrangement.

I note that Plaintiffs' counsel gave Plaintiffs a 10–percent discount in light of the volume of work generated by Lutheran Medical Center. This discount applied to fees, but not to expenses. Plaintiffs request that their fee award not reflect this discount.

I do not agree with Plaintiffs and I have accordingly reduced the requested fee by 10 percent. This discount reflects a reality in the marketplace: large-volume producing clients, who promptly pay their fees, can demand, and obtain, discounts from law firms primarily because of the economies of scale present in the legal business, as in any other business. There is no reason to ignore what the market evidently dictated in terms of discounts, just as there is no reason to ignore what the market evidently dictated in terms of customary hourly rates.

### 7. Time Limitations

There is no evidence to suggest that this case imposed any particular time limitations on counsel.

### 8. Amount Involved and Results Obtained

This case was a suit for money. The recovery of approximately $66,000.00 was nearly 100 percent of the amount sought in the Complaint in this case. The results obtained were therefore quite good.

### 9. Experience, Reputation, and Ability of Attorneys

The law firm which represented Plaintiffs is highly regarded. Steven D. Davidson, Plaintiffs' lead counsel, is a fifth-year litigation associate who graduated Phi Beta Kappa from the University of Nebraska–Lincoln in 1983. (Filing 129, Aff. Steven Davidson, ¶ 3.) He went on to attend the University of Nebraska College of Law, graduating with high distinction in 1986 after serving as a member of the law review. (*Id.*) From 1986 through 1988, Mr. Davidson clerked for the Honorable C. Arlen Beam, both when Judge Beam was Chief United States District Judge for the District of Nebraska and when he became a judge of the United States Court of Appeals for the Eighth Circuit. (*Id.*) Mr. Davidson, like his law firm, is well regarded. He displayed outstanding trial skills during this case.

### 10. Undesirability of the Case

There was nothing particularly undesirable about this case that would cause counsel to suffer a hardship in the community.

### 11. Nature and Length of Relationship with Clients

There was nothing about the nature or length of the relationship with the clients which would justify special mention.

### 12. Awards in Similar Cases

It is helpful to arrive at some understanding of awards in similar cases, and then to compare those awards to the award I make in this case.

To the extent that ERISA cases are similar to civil rights cases, I awarded total fees of $47,722.22 [7] in a case of comparable complexity, which took approximately five days to try to a jury, with far less favorable results. *Smith v. Casmer*, No. 89–0–194 (Kopf, J., Mem. & Order of 3/27/91) (compensatory damages of $2,500.00 and punitive damages of $1,100.00 in a civil rights case where the plaintiff prevailed on one of three claims).

However, other types of litigation of a commercial nature tend to generate higher fees. For example, in a somewhat more complex case involving a suit by the corporate owner of a "key-man" life insurance policy, I recently awarded $95,000 in total fees in a case which took about six days to try to a jury.[8] *Johnson Int'l v. Jackson Nat'l Life Ins.*, 812 F.Supp. 966 (Kopf, J., Mem. & Order of 1/27/93) (awarding $95,000.00 in fees on a principal recovery of $250,000.00 in a breach-of-contract case).

---

**7.** This award consisted of an attorneys' fee of $44,316.00 plus expenses of $3,406.22.

**8.** The award did not break down fees and expenses, but the amount of fees claimed as a component of the attorney fee was $8,028.81 (slip op., at 34).

Thus, roughly comparable work, requiring approximately the same amount of time, generates highly variable fees. This is undoubtedly true because it is unusual to award attorney fees due to the so-called American rule, which generally prohibits the awarding of attorney fees, and because there are peculiarities in each of the cases which make comparison difficult.

 Notwithstanding the difficulty in finding good comparisons, I believe that attorney fee awards in most ERISA cases in the current market should approximate one-third of the amount recovered. For example, in *Jacobs*, 933 F.2d at 655, the court approved an award of approximately 31 percent of the principal amount recovered (attorney fees of $272,073.25 on a principal amount recovered of $881,659.00).[9] But even though something in the neighborhood of one-third of the recovery may be an appropriate bench mark when considering attorney fees in most ERISA cases, this is an unusual case.

The amount of work required of Plaintiffs' counsel was in large measure a result of the various defenses asserted by Defendant, most of which I found pretextual. For example, Defendant requested complicated discovery concerning hospital rates, contractual discounts to third parties, and other items which required a good deal of effort on the part of Plaintiffs' counsel, but yielded no substantive benefit to Defendant at trial. Given the fact that this case involved twelve disputed motions, nineteen depositions, ten discovery requests, three expert witnesses, a lengthy brief from Plaintiffs' counsel in response to Defendant's trial briefs (which exceeded one hundred pages), and a five-day trial wherein numerous witnesses were presented—all to determine a fairly simple coverage question—I think it would be inequitable to penalize Plaintiffs' counsel for doing what they had to do in order to fairly represent their clients. I decline to do so.

A good example of what I am concerned about may be found in Defendant's reply brief to the reply brief of Plaintiff[10]. In that reply brief, Defendant's counsel represents that: "The Eighth Circuit allows sinners repentance even if they subsequently deny the claim at a reopening." (Def.'s Br. Opp'n Allowance of Att'y Fees & Allowance of Reply Br. Without Right of Reply by Def. at 8.) In support of this contention, Defendant cites *Short v. Cent. States, Southeast & Southwest Areas Pension Fund,* 729 F.2d 567, 574–75 (8th Cir.1984). Defendant's counsel then suggests that Plaintiffs' "counsel even sent a letter **allowing** reconsideration of all evidence over [sic, after] a two year period of discovery at the reopening. See Exhibit No. 125." (Def.'s Br. Opp'n Allowance of Att'y Fees & Allowance of Reply Br. Without Right of Reply by Def. at 8 (emphasis added).)

Evidently these arguments were intended to convince me that Defendant's actions after the first claims denial were not a "smoke screen" or a pretext. But Defendant's arguments are misleading. The citation to *Short* is misleading. The reference to the letter from Plaintiffs' counsel is misleading.

With reference to the *Short* case, while the Court of Appeals noted that under certain circumstances a pension plan may reevaluate a prior claims denial and avoid exposure under ERISA, the Court also made it very clear that:

> [a] *post hoc* attempt to furnish a rationale for a denial of pension benefits in order to avoid reversal on appeal, and thus meaningful review, diminishes the integrity of the Fund and its administrators. ERISA and its accompanying regulations "were intended to help claimants process their claims efficiently and fairly; they were not intended to be used by the Fund as a smoke screen to shield itself from legitimate claims."

*Short,* 729 F.2d at 575 (quoting *Richardson v. Cent. States, Southeast & Southwest Areas*

---

9. It is noteworthy that the plaintiffs in *Jacobs* did not prevail on all claims. It is also noteworthy that *Jacobs* was a class-action suit involving thirty-eight plaintiffs. The average principal recovery in *Jacobs* was about $23,202 per plaintiff, and each plaintiff paid about $7,160 in attorney fees. Thus, there were economies of scale available to counsel for the *Jacobs* plaintiffs which were not available to Plaintiffs' counsel in this case.

10. Defendant's presentation of a "reply to a reply" is extraordinary.

*Pension Fund,* 645 F.2d 660, 665 (8th Cir. 1981)).

This case clearly presented the type of *post hoc* rationalization found improper in *Short.* Indeed, the "Final Claims Review Decision," so titled on the exhibit list, (Filing 122, Def.'s List at 4), is simply a letter from Defendant's counsel, dated after the pretrial conference order in this case, containing nothing more than a reference to the trial briefs and proposed findings of fact (Def.'s Ex. 192) as a basis for the "final" decision. The "final claims review decision" does not comply with *Short* in that (a) the letter was not written by Defendant's trustees and cannot fairly be construed as the trustee's decision, and (b) it contains no reasons for the "decision", but rather refers to legal briefs and the like prepared by counsel.

Moreover, the suggestion that Plaintiffs' "counsel even sent a letter **allowing** reconsideration of all evidence ... See Exhibit No. 125" (emphasis added) is grossly misleading. The letter referred to is addressed to counsel for Defendant from counsel for Plaintiffs. In that letter, Plaintiffs' counsel makes it clear that Defendant previously made a final decision: **"We are also concerned with the fact that the Plan is purporting to treat the claim as something other than finally determined. The Plan made a final determination on the claim prior to the initiation of this litigation."** (Pls.' Ex. 125 (emphasis added).) While counsel did suggest that if Defendant intended to reconsider its determination, it should do so on the basis of all the evidence gathered during the nearly two years of discovery in the lawsuit, in no realistic sense can Plaintiffs' Exhibit 125 be construed as "a letter **allowing** reconsideration of all evidence." Quite the contrary, it appears to be an objection to such a procedure.

These arguments, reiterated in a "reply to a reply," demonstrate the tedious and expensive nature of this lawsuit—a result primarily of the litigation tactics of Defendant. Thus, while attorney fees exceeding one third of the recovery in an ERISA case may not be the norm, such an award is justified here.

Accordingly,

IT IS ORDERED that:

(1) Plaintiffs' Application for Attorney Fees, (Filing 127), and supplemental application, are granted as provided herein;

(2) Defendant's Response to Application for Attorney Fees, (Filing 130), is denied;

(3) The Clerk of the United States District Court for the District of Nebraska shall immediately enter judgment providing that: "Judgment is entered in favor of Plaintiffs and against Defendant for (a) $66,000.27 and prejudgment interest from August 2, 1989, determined under Nebraska law; (b) costs of suit to be taxed by the Clerk of the United States District Court; (c) attorney fees (including costs normally considered as a component of attorney fees) of $49,299.69, and (d) postjudgment interest accruing from and after the date of judgment."