**G. William ORR, M.D., on behalf of himself and the Medicaid-eligible women seeking abortions he serves; and Womens Services, P.C., Plaintiffs,**

v.

**E. Benjamin NELSON, in his official capacity as Governor of the State of Nebraska; Donald Stenberg, in his official capacity as Attorney General of the State of Nebraska; and Mary Dean Harvey, in her official capacity as Director of the Nebraska Department of Social Services, Defendants.**

No. 4:CV94–3252.

United States District Court,
D. Nebraska.

Jan. 25, 1995.

---

Lawrence I. Batt, Batt & Associates, Omaha, NE, Simon Heller, New York City, for plaintiffs.

David T. Bydalek, Asst. Atty. Gen., Lincoln, NE, for defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

On November 4, 1994 (filing 19) I granted declaratory and injunctive relief in favor of Plaintiffs and against Defendants after I found that Nebraska's Medicaid regulations violated the Supremacy Clause of the Constitution because those regulations conflicted with federal law found in the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1994, P.L. 103–112, § 509, 1993 U.S.C.C.A.N. 107 (Stat.) 1082, 1113 (October 21, 1993) (hereinafter "1994 Hyde Amendment".) The 1994 Hyde Amendment provided that: "None of the funds appropriated

under this Act *shall* be expended for any abortion *except* when it is made known to the Federal entity or official to which funds are appropriated under this Act that such procedure is necessary to save the life of the mother *or that the pregnancy is the result of an act of rape or incest.*" (emphasis added.)

I believed the Supremacy Clause was violated because Nebraska, despite the provisions of the 1994 Hyde Amendment, having accepted federal Medicaid monies, refused to use those monies to pay for abortions in the case of pregnancy caused by rape or incest. Virtually every case to consider the issue had concluded that the 1994 Hyde Amendment (and other similar amendments) when read in light of the remainder of Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.* (1994) constituted a mandatory directive to states, such as Nebraska, to spend federal Medicaid monies for abortions sought by otherwise eligible women who were pregnant as "the result of an act of rape or incest". (Filing 19 at 8.)

Now, Plaintiffs claiming to have prevailed under 42 U.S.C. § 1983 (1994), seek attorney fees pursuant to 42 U.S.C. § 1988(b) (1994) totalling nearly $10,000.00 (filing 26). I shall grant the Plaintiffs' motion in part and deny the motion in part, and award Plaintiffs' attorney fees (and associated expenses) in the sum of $5,456.08.[1]

### I.

A brief review of the procedural history of this case, followed by a brief review of the facts relevant to the attorney fee issue, is in order.

### A.

Plaintiffs commenced this case claiming an entitlement to injunctive and declaratory relief pursuant to the Supremacy Clause of the Constitution, art. VI, cl. 2 *and* 42 U.S.C. § 1983. (Filing 1, Complaint ¶ 1.) Plaintiffs were represented by Lawrence I. Batt (Batt)

an Omaha, Nebraska lawyer and Simon Heller (Heller) a New York lawyer. Batt and Heller filed the complaint on August 12, 1994. (Filing 1.)

Defendants answered the complaint on September 1, 1994. (Filing 5.) Plaintiffs moved for summary judgment on September 8, 1994. (Filing 7.) After I granted Defendants an extension of time within which to respond, Defendants responded to the motion for summary judgment on October 31, 1994. Judgment was entered for Plaintiffs on November 4, 1994. (Filings 19 & 20.)

Plaintiffs then sought an extension of time to file their application for attorney fees pursuant to Fed.R.Civ.P. 54(d)(2)(B). (Filing 21.) Plaintiffs were allowed until December 2, 1994 to file their application. (Filing 22.) On December 1, 1994, Defendants filed their notice of appeal. (Filing 23.) On December 2, 1994, Plaintiffs filed their application for attorney fees and expenses (Filing 26) supported by the affidavit of Batt (attachment to Filing 26) and the affidavit of Heller (attachment to Filing 26). Defendants submitted a brief in opposition which was received on December 19, 1994, and copies of various complaints filed in other similar cases. (Filing 31.) Plaintiffs were directed to submit, and did submit on December 30, 1994, a reply brief especially addressing the Defendants' argument that 42 U.S.C. § 1988 did not authorize an award of attorney fees because relief was predicated on the Supremacy Clause. (Filing 33.) Defendants sought and received authorization to submit a reply to Plaintiffs' reply brief and they submitted their additional brief on January 10, 1995 (Filing 36.) The matter is now ripe for resolution.

### B.

Batt's affidavit establishes that: (1) he has been admitted to practice in the State of Nebraska since 1971; (2) he has significant litigation experience in cases of this kind in

---

1. The Court entered judgment before receipt of the attorney fee application because of the possibility of irreparable injury to indigent women should injunctive relief be delayed by a controversy over attorney fees. While entry of judgment on the merits without resolution of the attorney fee issue created the possibility of multiple appeals, the possibility of irreparable injury to indigent victims of rape or incest overcame any jurisprudential concerns about multiple appeals.

federal court; (3) his normal hourly rate charged to fee paying clients is $175.00; (4) his associate's normal hourly rate charged to fee paying clients is $105.00; (5) Batt agreed to represent Plaintiffs with the understanding that the fee, if any, awarded by this Court would be the extent of his compensation; (6) Batt, who kept contemporaneous time records, spent approximately 23.8 hours on this case; (7) Batt's associate, who kept contemporaneous time records, spent 1.1 hours on this case; (8) Batt expended $364.46 in out-of-pocket costs associated with this case as more particularly itemized in the affidavit.

Heller's affidavit establishes that: (1) he has been admitted to practice in the State of New York since 1986; (2) he has significant litigation experience in cases of this kind in federal court; (3) he has no normal hourly billing rate as he works for the Center for Reproductive Law & Policy (CRLP), but he has been awarded attorney fees at rates ranging from $95.00 per hour to $135.00 per hour in the past and he thus believes that an hourly rate of $175.00 per hour is reasonable in this case; (4) Heller, who kept contemporaneous time records, spent approximately 28.5 hours on this case; (5) Heller, on behalf of CRLP, expended in out-of-pocket costs associated with this case as more particularly itemized in the affidavit the sum of $293.62. Subsequently, Heller has indicated that he spent an additional 5.0 hours drafting the reply brief. Thus, Heller claims to have spent 33.5 hours working on this matter.

## II.

There are essentially two legal issues presented by the submission of the parties: (1) whether Plaintiffs are entitled to attorney fees under 42 U.S.C. § 1988 inasmuch as they prevailed upon a Supremacy Clause claim, brought in part pursuant to 42 U.S.C. § 1983, regarding enforcement of the 1994 Hyde Amendment, and, (2) if so, what is the proper amount of such an award. I turn to a resolution of those issues next.

## A.

As to the first question, Defendants argue that since the Supremacy Clause does not itself create federal rights, a point not disputed by Plaintiffs,[2] and since the 1994 Hyde Amendment does not impose an *unambiguous* obligation on the States to fund abortions, a point which *is* hotly disputed by Plaintiffs, there is no federal right enforceable under section 1983[3] and thus no entitlement to attorney fees under section 1988(b)[4].

Among other cases, the Defendants rely heavily upon the Supreme Court's recent decision in *Suter v. Artist M.*, 503 U.S. 347, ——, 112 S.Ct. 1360, 1370, 118 L.Ed.2d 1 (1992). In that case the Court held that the "reasonable efforts" clause, contained in the Adoption Assistance and Child Welfare Act, which created a federal reimbursement program for expenses incurred by States in administering foster care and adoption services and required states to make reasonable efforts to keep a child in the family home before placing the child in a foster home, did not create a right, privilege or immunity enforceable under section 1983. The Court believed the "reasonable efforts" language was "plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary...." *Id.* at ——, 112 S.Ct. at 1370.

With *Suter* and the rest of the cases cited by Defendants firmly in mind, I turn next to the task of determining whether the 1994 Hyde Amendment unambiguously created a federal right enforceable by Plaintiffs such that it is actionable under 42 U.S.C. § 1983,

2. *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107, 110 S.Ct. 444, 449, 107 L.Ed.2d 420 (1989).

3. Section 1983 provides liability for those persons who under color of state law deprive a person of "any rights, privileges, or immunities secured by the Constitution *and laws....*" (emphasis added). The section 1983 remedy has been held to encompass violations of federal stat-

utory law as well as constitutional rights. *Golden State Transit Corp.*, 493 U.S. at 105, 110 S.Ct. at 447–48.

4. Section 1988(b) provides in part that in actions brought pursuant to section 1983 a court may grant the prevailing party (other than the United States) a reasonable attorney fee.

thereby justifying an award of attorney fees under 42 U.S.C. § 1988(b).

In a recent case from the United States Court of Appeals for the Eighth Circuit it was recognized that, while the Supreme Court in *Suter* "did not proceed analytically as it had in recent precedents", the *Suter* opinion nevertheless did not reverse other Supreme Court opinions on the question. *Arkansas Medical Society, Inc., v. Reynolds,* 6 F.3d 519, 524 (8th Cir.1993) (holding that a provision of the Medicaid law that required reimbursement rates to providers be sufficient to enlist enough providers so that care and services are available under the plan to the extent such care and services are available to the general population created a federal right enforceable under section 1983 by providers and Medicaid recipients.)

The Court of Appeals also stressed that the *Suter* opinion did not replace the Supreme Court's prior "framework with a different analytical model." *Id.* The Court of Appeals then held that it would follow the analytical procedure outlined in *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. at 106, 110 S.Ct. at 448 (hereinafter "*Golden State* "). *Id.* at 525. The Court of Appeals added, however, that it would bear in mind the considerations found especially important in *Suter,* to wit: the right must be unambiguously conferred before section 1983 comes into play and each statute must be examined on its own. *Id.*

As the Court of Appeals noted in *Arkansas Medical Society, Inc., id.* at 523, *Golden State* established a two-step procedure for analyzing section 1983 enforceability questions. In step one, where the plaintiff has the burden, a court must determine whether a federal right is involved, and a court does this by: (a) determining whether the federal legislation creates binding obligations on state government; (b) determining whether the interests of the plaintiffs are too vague or amorphous as to put the matter beyond the competence of the judiciary, and (c) determining whether the provision at issue was intended to benefit the putative plaintiff. *Golden State,* 493 U.S. at 106, 110 S.Ct. at 448.

In step two, where the defendant bears the burden, the inquiry focuses on whether Congress has provided a comprehensive and carefully tailored remedial scheme within the statute in question, so as to make enforcement under section 1983 inconsistent. *Id.*

Despite this two-step approach, the *Suter* case emphasizes that before section 1983 comes into play a court must find that the right is "unambiguously" conferred, and one does this by judging each statute separately. *Arkansas Medical Society, Inc.,* 6 F.3d at 525.

■ I turn to the first step. Initially I must determine whether the federal law imposes an *unambiguous* mandatory obligations on the States. This is the primary area of disagreement between the parties.

Defendants assert that the 1994 Hyde Amendment does not unambiguously create a federal right because "there is nothing in Title XIX that purports to place any obligation on the States to fund abortion." Defendants' Reply Brief to Plaintiffs' Brief on Defendants' Supremacy Clause Argument, at 6. Defendants are simply wrong: Title XIX, when read in light of the 1994 Hyde Amendment, does unambiguously require the states to fund medically necessary abortions in certain cases.

As Justice Scalia has recently stated, at least four circuit courts have since 1980 "uniformly supported [the] premise" that "Title XIX requires States participating in the Medicaid program to fund abortions (at least 'medically necessary' ones) unless federal funding for those procedures is proscribed by the Hyde Amendment." *Edwards v. Hope Medical Group,* —— U.S. ——, ——, 115 S.Ct. 1, 2, 129 L.Ed.2d 903 (1994) (J. Scalia) (denying stay from an order prohibiting enforcement of Louisiana ban on abortions) (*citing Roe v. Casey,* 623 F.2d 829, 831, 834 (3d Cir.1980); *Hodgson v. Board of County Comm'rs,* 614 F.2d 601, 611 (8th Cir.1980); *Zbaraz v. Quern,* 596 F.2d 196, 199 (7th Cir.1979), *cert. denied,* 448 U.S. 907, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980); *Preterm, Inc. v. Dukakis,* 591 F.2d 121, 126–27, 134 (1st Cir.), *cert. denied,* 441 U.S. 952, 99 S.Ct. 2181, 2182, 60 L.Ed.2d 1057 (1979).)

As Justice Scalia further noted there is no contrary circuit precedent, and without a "split" in the circuits it is unlikely that the Supreme Court will review this settled area of the law: "We have already denied certiorari in two of those cases, and it is in my view a certainty that four Justices will not be found to vote for certiorari on the Title XIX question unless and until a conflict in the Circuits appears." *Edwards,* —— U.S. at ——, 115 S.Ct. at 2.

Thus, by 1980 with four circuit court opinions on point it was clear that, as Justice Scalia has stated, *unless* the Hyde amendment proscribed federal funding for abortions "Title XIX requires States participating in the Medicaid program to fund abortions ...." *Id.* In apparent response to this recognized rule of law, Congress amended the Hyde Amendment[5] in 1981 so as to give the states discretion on the subject. It did so by adding the following language to the Hyde Amendment: "Providing, however, that the several States are and shall remain free not to fund abortions to the extent that they in their sole discretion deem appropriate." (Filing 19, at 4 (finding of fact 13) *citing* Supplemental & Continuing Appropriations & Recision Act of 1981, Pub.L. No. 97–12, § 109, 95 Stat. 95 (1981).) However, since 1984 such discretionary language has been absent from the Hyde Amendment. *Id.*

When a statute, like the Hyde Amendment, has "been given a consistent judicial construction", and Congress chooses to reenact the statute, without substantial modification, as in the case of the 1994 Hyde Amendment, a court may "adhere to that construction in interpreting the reenacted statutory language." *Central Bank v. First Interstate Bank,* —— U.S. ——, ——, 114 S.Ct. 1439, 1452, 128 L.Ed.2d 119 (1994) (*citing Keene Corp. v. United States,* —— U.S. ——, ——, 113 S.Ct. 2035, 2043, 124 L.Ed.2d 118 (1993); *Pierce v. Underwood,* 487 U.S. 552, 567, 108 S.Ct. 2541, 2551, 101 L.Ed.2d 490 (1988); *Lorillard v. Pons,* 434 U.S. 575, 580–81, 98 S.Ct. 866, 869–70, 55 L.Ed.2d 40 (1978).)

As Justice Scalia has observed, since 1980 numerous judicial opinions have squarely construed Title XIX to require states participating in the Medicaid program to fund medically necessary abortions *unless proscribed by the Hyde Amendment.* Accordingly, by reenacting the Hyde Amendment in 1994 thereby authorizing the use of federal funds for some abortions, while not at the same time explicitly making the use of Medicaid funds discretionary for such abortions (as Congress did in 1981), it is entirely appropriate to adhere to the "consistent judicial construction" referred to by Justice Scalia in *Edwards* when "interpreting the reenacted statutory language." *Central Bank,* —— U.S. at ——, 114 S.Ct. at 1452. That settled judicial construction, particularly the judicial construction given the virtually identical Hyde amendment discussed in *Roe v. Casey,* 623 F.2d at 831–36, leaves no doubt on the matter: "Title XIX, as now modified [by the Hyde Amendment], requires the states to fund abortions in two categories: where the mother is endangered and where the pregnancy was the result of rape or incest." *Id.* at 836.

I am consequently satisfied that the premise of Defendants' argument, that the 1994 Hyde Amendment does not unambiguously create a federal right because "there is nothing in Title XIX that purports to place any obligation on the States to fund abortion," is wrong. Defendants' Reply Brief to Plaintiffs' Brief on Defendants' Supremacy Clause Argument at 5. Moreover, since the courts have consistently held for more than 14 years that the states are obligated to fund medically necessary abortions under Medicaid unless the Hyde Amendment provides otherwise; and since Congress has obviously been aware of this interpretation and has chosen not to continue to give the states discretion regarding funding for abortions otherwise authorized by the Hyde Amendment; and since the 1994 Hyde Amendment (whatever else it may mean) specifically contemplates the use of Medicaid funds for abortions necessitated by rape or incest, I find and conclude that the 1994 Hyde Amendment imposed an *un-*

5. Each year since 1977 a so-called "Hyde Amendment" has been added to federal appropriations bills. This amendment sets forth under what circumstances (if any) federal funds are used for Medicaid abortions. (Filing 19, at 3 (finding of fact 10).)

*ambiguous* mandatory obligation on the states to fund abortions under Medicaid in the case of rape or incest.

The second and third prongs of step one are related, and may, in this case, be resolved easily. Obviously there is nothing vague or amorphous about the claim of Dr. Orr and his clinic that would put this case beyond the competence of this court to decide. *Arkansas Medical Society, Inc.,* 6 F.3d at 526 (noting that the Court of Appeals had previously "determined that 'Medicaid service providers' could enforce compliance with the Medicaid laws." (*quoting Nebraska Health Care Ass'n v. Dunning,* 778 F.2d 1291, 1295 (8th Cir.1985), *cert. denied,* 479 U.S. 1063, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987).) Moreover, the statutory benefits of the Hyde Amendment read in light of the entirety of Title XIX, that federal funds shall be used to fund abortions in the case of rape or incest, are "sufficiently specific to be enforceable by Medicaid providers." *Arkansas Medical Society, Inc.,* 6 F.3d at 527. Indeed, it is self-evident from a plain reading of the 1994 Hyde Amendment that Medicaid providers of abortion services are among the ultimate beneficiaries of the statute.

I turn next to step two. In this regard, I must determine whether Congress has provided a comprehensive and carefully tailored remedial scheme within the statute in question so as to make enforcement under section 1983 inconsistent. Defendants, who have the burden at this point in the inquiry, have failed to point out any instance where Congress has indicated a desire to foreclose section 1983 enforcement of these types of claims. Indeed, the United States Court of Appeals for the Eighth Circuit has held that "Congress had not foreclosed section 1983 enforcement in the Medicaid statute." *Arkansas Medical Society, Inc.,* 6 F.3d at 528. (*citing Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 520–23, 110 S.Ct. 2510, 2523–25, 110 L.Ed.2d 455 (1990).) Accordingly, I find that there is no impediment in the statute to section 1983 enforcement of Plaintiffs' claims.

In summary, the claims of the Plaintiffs in this case are enforceable under 42 U.S.C. § 1983 because:

(1) since 1980 every circuit court to have confronted the question has "uniformly supported [the] premise" that "Title XIX requires States participating in the Medicaid program to fund abortions (at least 'medically necessary' ones) unless federal funding for those procedures is proscribed by the Hyde Amendment", *Edwards v. Hope Medical Group,* — U.S. at —, 115 S.Ct. at 2 (J. Scalia);

(2) Congress, although once granting states the discretion to withhold funding for any abortions by amending the annual Hyde Amendment, stopped using the discretionary language in the Hyde Amendment in 1984;

(3) Given the consistent judicial construction of the statute noted by Mr. Justice Scalia, the right to Medicaid funding for abortions related to pregnancy caused by rape or incest is unambiguously provided for in Title XIX as modified by the 1994 Hyde Amendment, which specifically contemplates the use of Medicaid funds for abortions in cases of rape or incest, because there is no proscription in the Amendment against the use of such funding for such abortions;

(3) there is nothing vague or amorphous about the claim of these health care providers to funding for abortions respecting pregnancy caused by rape or incest that would put this case beyond the competence of this court to decide;

(4) the statutory benefits of the 1994 Hyde Amendment (funding for abortions respecting pregnancy caused by rape or incest) read in light of the entirety of Title XIX, are sufficiently specific to be enforceable by Medicaid providers and such providers are among the ultimate beneficiaries of the statute; and,

(5) Congress has not foreclosed section 1983 enforcement in the Medicaid statute.

As a result, Plaintiffs are entitled to assert a claim for attorney fees under section 1988(b) as the action is maintainable under section 1983.

**B.**

Having found that section 1988(b) is properly implicated in this case, I turn to the question of whether Plaintiffs are otherwise

entitled to attorney fees pursuant to section 1988(b), and, if so, the amount of that entitlement. I recently set forth my views in detail on the proper analytical method I shall follow in cases such as this, and I therein explored in depth the appropriate range of fees in the relevant economic market. *El Tabech v. Gunter,* 869 F.Supp. 1446 (D.Neb.1994) (awarding attorney fees under section 1988(b) in the sum of $168,543.27 at rates for lawyers ranging from $105.00 per hour to $85.00 per hour, after trial of case involving the Eighth Amendment and the Nebraska State Penitentiary). *See also Lutheran Medical Ctr. v. Contractors, Laborers, Teamsters and Engineers Health and Welfare Plan,* 814 F.Supp. 799 (D.Neb.1993), *aff'd,* 25 F.3d 616 (8th Cir.1994) (awarding attorney fees in ERISA case after a trial in the sum of $49,299.60 at effective hourly rate of $82.00 per hour for lawyers); *Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.,* 812 F.Supp. 966 (D.Neb.1993), *aff'd in relevant part,* 19 F.3d 431 (8th Cir.1994) (awarding attorney fees in insurance contract case after a trial in the sum of $95,000 at hourly rates for lawyers ranging from $85.00 per hour to $120.00 per hour.); Alan Hirsch & Diane Sheehey, *Awarding Attorneys' Fees and Managing Fee Litigation* (Federal Judicial Center 1994). I shall not therefore endeavor to restate those views in detail here.

■ Suffice it to say that I must engage in a three-step inquiry. I must (1) determine whether Plaintiffs are prevailing parties, and, even if so, whether an award of attorney fees is otherwise inappropriate; (2) determine the "lodestar"; and (3) determine whether any adjustments in the lodestar are warranted, and, if so, make such adjustments. I turn to that task now.

The first inquiry is whether Plaintiffs are prevailing parties. Plaintiffs are prevailing parties as they accomplished virtually all they sought to accomplish when they prevailed on their motion for summary judgment and they substantially changed the legal relationship of the parties as a result. Moreover, there are no special circumstances which would render an award of attorney fees unjust or improper in this case.

Second, I must determine the "lodestar"—the number of hours reasonably expended, multiplied by the applicable hourly *market* rate for the relevant legal services.

■ The reasonable hourly rate is determined by reference to the relevant marketplace, which in this case is Lincoln and Omaha in the federal civil rights context. While Plaintiffs' counsel suggest that a reasonable hourly rate is $175.00 per hour for lead counsel, I do not agree that the relevant marketplace would recognize hourly rates of $175.00 per hour as reasonable. Rather, I believe that rates ranging from $85.00 per hour to $105.00 per hour is a more accurate depiction of what the local market would dictate as a reasonable hourly rate for litigation of this type. I therefore find and conclude that Batt is entitled to a fee calculated at $105.00 per hour, that Batt's associate is entitled to a fee calculated at the rate of $85.00 per hour, and that Heller is entitled to a fee calculated at the rate of $105.00 per hour.

I must next determine the number of hours reasonably expended on this matter. The total hours claimed by all time keepers is 58.4 hours. I agree with Defendants that there appears to have been some duplication of service, some unnecessary work, and some work for which records are not adequate. Brief in Opposition to Plaintiffs' Application for Attorneys Fees and Expenses, at 8–13. I believe a reduction of 20 percent (as suggested by Defendants) is appropriate to account for these problems. I therefore shall approve a "lodestar" based upon 46.72 hours (or 80% of each timekeepers' claim).

■ When calculating the lodestar it is appropriate to add expenses of counsel which are customarily charged in the relevant economic market as a component of an attorney fee. With two exceptions I believe that all of the expenses claimed by Plaintiffs counsel were reasonably expended and would have been charged as a component of an attorney fee in the relevant market.

■■ Mr. Heller and his colleague Ms. Benshoff paid $100.00 to be permanently admitted to practice in this court. I shall approve $25.00 of this claim as that is the cost of a one-time admission for one out-of-state

lawyer. There was no need to have out-of-state counsel admitted to practice permanently in this court in order to prosecute the instant litigation when a one-time admission fee would have sufficed to authorize Mr. Heller to participate in this case. Moreover, I believe such an expense is reimbursable only for Mr. Heller since Ms. Benshoff did not actively participate in this case. I also do not believe that Mr. Batt's annual fee to practice in this court in the sum of $15.00 is a proper component of an attorney fee award as that is a cost that is not primarily attributable to this litigation. Accordingly, I shall reduce the claimed expenses by $90.00. As a consequence, I shall award expenses, as a component of an attorney fee, in the sum of $568.08 (Batt = $349.46 and Heller = $218.62).

Third, I must determine whether there is any need to adjust the "lodestar" either upward or downward. I find no need to make any such adjustment, and I do not understand any party to make such a request.

Accordingly, I shall award an attorney fee in the sum of $5,456.08. This award consists of the following: (1) Batt's "lodestar" (before expenses) of 19.04 hours times $105.00 per hour or $1,999.20; (2) Batt's associate's "lodestar" (before expenses) of .88 hours times $85.00 per hour or $74.80; (3) Batt's expenses of $349.46; (4) Heller's "loadstar" (before expenses) of 26.80 hours times $105.00 per hour or $2,814.00; and (5) Heller's expenses of $218.62.

### III

Defendants request that I stay the award of attorney fees pursuant to Fed.R.Civ.P. 62(d) until the appeal on the merits has been exhausted. I do not think such a stay is necessary, advisable or proper. However, I advise Plaintiffs' counsel that I will likely approve a supersedeas bond in this case without the necessity of a surety should Plaintiffs endeavor to execute upon the judgment for attorney fees before completion of the appellate process. I thus suggest that Plaintiffs agree that they will not seek to enforce the judgment on attorney fees pending completion of the appeal on the merits.

Accordingly,

IT IS ORDERED that:

1. Plaintiffs' motion (Filing 26) for attorney fees is granted in part and denied in part as provided herein;

2. Judgment shall be entered by separate document providing that: "Judgment is entered for Plaintiffs and against Defendants ordering that Defendants, jointly and severally, shall pay Plaintiffs the sum of $5,456.08 as an attorney fee together with post-judgment interest."