Mohamed Abdul Hafiz El TABECH, Plaintiff,

v.

Frank GUNTER, et al., Defendants.

Victor LUNA, et al., Plaintiffs,

v.

Harold CLARKE, et al., Defendants.

Reginald PIERCE, et al., Plaintiffs,

v.

Harold CLARKE, et al., Defendants.

Jerry JENSEN, et al., Plaintiffs,

v.

Frank GUNTER, et al., Defendants.

Nos. CV87–L–377, CV87–L–476, CV87–L–497 and CV87–L–607.

United States District Court,
D. Nebraska.

Dec. 1, 1994.

**MEMORANDUM AND ORDER**

KOPF, District Judge.

Two motions [1] are pending before me: The defendants have moved the court (Filing 255) to revoke its prior order indicating that injunctive relief would be granted, arguing that recently enacted federal legislation precludes such relief; and the plaintiffs have moved the court (Filing 252) for an award of attorney fees and expenses, arguing that they are prevailing parties entitled to such an award under federal law.

I shall deny the defendants' motion. I shall grant the plaintiffs' motion in part and deny it in part, awarding the plaintiffs attorney fees and expenses. The plaintiffs request attorney fees of approximately $321,-705.38 [2] and expenses of $10,321.83, but I shall limit the attorney-fee award to $168,-543.27, plus expenses of $10,321.83.

## I. VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994

These consolidated cases are class-action civil-rights cases brought by inmates at the Nebraska State Penitentiary (NSP) challenging their conditions of confinement.

After an 18–day trial to the court, the court determined, among other things, that the evidence proved an Eighth Amendment violation regarding the random placement of newly arrived inmates in double cells at NSP's main housing units. *Jensen v. Gunter*, 807 F.Supp. 1463 (D.Neb.1992). Thereafter, the court considered the contours of appropriate injunctive relief and in August, 1994, notified the parties of the terms and conditions the court would incorporate in its injunctive order.

The court subsequently became aware of the so-called Violent Crime Control and Law Enforcement Act of 1994 [hereinafter "Act"], particularly section 20409 of the Act. Pub.L. No. 103–322, 108 Stat. 1796, 1827–28 (Sept.

Gregory D. Barton, Harding & Ogborn, Robert W. Shively, Jr., DeMars, Gordon, Olson, Recknor & Shively, Barry L. Hemmerling, Jeffrey, Hahn & Hemmerling, Lincoln, NE, Scott D. Freese, Hutton & Freese, Norfolk, NE, for plaintiffs.

Don Stenberg, Atty. Gen., Terri M. Weeks, Asst. Atty. Gen., Lincoln, NE, for defendants.

1. Unless otherwise indicated, all filing numbers refer to case No. CV87–L–377.

2. *See* Filing 263 App. O. I say "approximately" because the calculation in the text is based upon the recapitulation of the defendants, and the plaintiffs' actual claims are not quite so precise. Nevertheless, the defendants' summary is a generally fair characterization of the plaintiffs' claims.

13, 1994) (to be codified at 18 U.S.C. § 3626 (1994)) [hereinafter "section 20409 of the Act"]. The court advised the parties of the provisions of the Act. Based on section 20409 of the Act, the defendants now move the court to set aside its decision to issue injunctive relief.

Section 20409 of the Act states:

(a) AMENDMENT OF TITLE 18, UNITED STATES CODE.—Subchapter C of chapter 229 of part 2 of title 18, United States Code, is amended by adding at the end the following new section:

§ 3626. Appropriate remedies with respect to prison crowding

(a) REQUIREMENT OF SHOWING WITH RESPECT TO THE PLAINTIFF IN PARTICULAR.—

(1) HOLDING.—A Federal court shall not hold prison or jail crowding unconstitutional under the eighth amendment except to the extent that an individual plaintiff inmate proves that the crowding causes the infliction of cruel and unusual punishment of that inmate.

(2) RELIEF.—The relief in a case described in paragraph (1) shall extend no further than necessary to remove the conditions that are causing the cruel and unusual punishment of the plaintiff inmate.

(b) INMATE POPULATION CEILINGS.—

(1) REQUIREMENT OF SHOWING WITH RESPECT TO PARTICULAR PRISONERS.—A Federal court shall not place a ceiling on the inmate population of any Federal, State, or local detention facility as an equitable remedial measure for conditions that violate the eighth amendment unless crowding is inflicting cruel and unusual punishment on particular identified prisoners.

(2) RULE OF CONSTRUCTION.—Paragraph (1) shall not be construed to have any effect on Federal judicial power to issue equitable relief other than that described in paragraph (1), including the requirement of improved medical or health care and the imposition of civil contempt fines or damages, where such relief is appropriate.

(c) PERIODIC REOPENING.—Each Federal court order or consent decree seeking to remedy an eighth amendment violation shall be reopened at the behest of a defendant for recommended modification at a minimum of 2–year intervals.

[18 U.S.C. § 3626 note:]

(b) APPLICATION OF AMENDMENT.—Section 3626 of title 18, United States Code, as added by paragraph (1), shall apply to all outstanding court orders on the date of enactment of this Act. Any State or municipality shall be entitled to seek modification of any outstanding eighth amendment decree pursuant to that section.

In essence, the defendants argue that under section 20409 of the Act injunctive relief is not appropriate in these cases because (1) the relief recommended by the magistrate judge and ordered by this court is premised on the fact that double-celling of inmates is required due to overcrowding at NSP, and the Act precludes such relief; and (2) the Act eliminates the use of class-action lawsuits to resolve claims that prison overcrowding violates the Eighth Amendment because individual plaintiffs must prove that overcrowding inflicts cruel and unusual punishment with respect to each plaintiff inmate, and class representatives cannot make (and have not made) such an individualized showing in class-action cases. I disagree with the defendants' arguments for three reasons.

## A.

■ First, even if section 20409 applied to class actions generally, it would not apply to these cases because these cases are not "crowding" cases within the meaning of the Act. As this court observed in its prior liability determination, "[t]his case is not an overcrowding case...." *Jensen v. Gunter,* 807 F.Supp. 1463, 1469 (D.Neb.1992). Indeed, when I determined to issue injunctive relief in these cases, I also found that "[h]ere, the violation was not overcrowding or double-celling per se, but rather random double-celling of new inmates without consideration of important data." (Filing 244, at 20.) Therefore, the provisions of section

20409 are inapplicable because these are not cases where the court has held "prison ... *crowding* unconstitutional under the eighth amendment. . . ." Section 20409(a)(1) of the Act (emphasis added).

### B.

■ Second, section 20409 of the Act has no application to these cases because these are class-action lawsuits, and section 20409 does not by its plain terms, or by reference to pertinent legislative history, indicate congressional intent to apply the Act to class-action suits.

Section (a)(1) of section 20409 of the Act states that "[a] Federal court shall not hold prison or jail crowding unconstitutional under the eighth amendment except to the extent that an individual plaintiff inmate proves that the crowding causes the infliction of cruel and unusual punishment of that inmate."

By its terms ("an individual plaintiff inmate"), section (a)(1) of the Act pertains to lawsuits involving individuals. Thus, section 20409(a)(1) would bar a federal court from imposing injunctive relief in a case brought by one or more individual inmates beyond the relief necessary to remedy the specific overcrowding grievance of the individual inmate(s) who brought suit.[3] However, there is nothing in section 20409 that expressly seeks to alter or amend the long-standing provisions of the Federal Rules of Civil Procedure authorizing the courts to issue relief to a "class" of individuals, so long as the class representatives prove the case for themselves and the unnamed members of the class. Indeed, the "rule of construction" found in section (b)(2) of the Act strongly implies that Congress had no intent to limit the power of a court to issue class-wide relief.

■ If there were any doubt about this fact, such doubt is resolved by reference to the report of the conference committee of the House and Senate. In that report, the conferees specifically stated that "[t]he Conferees note that this section has no effect on the certification or success of class action lawsuits." Joint Explanatory Statement of the Comm. of Conference, Amendment of the House to the Bill (H.R. 3355) to amend the Omnibus Crime Control and Safe Streets Act of 1968, 140 Cong.Rec. H7474 (daily ed. Aug. 10, 1994).[4] *See also* Joint Explanatory Statement of the Comm. of Conference, 140 Cong. Rec. H8868 (daily ed. Aug. 21, 1994) ("The Conferees note that this section [20409] has no effect on the certification or success of class action lawsuits.").

Thus, whether the plain words of the statute are reviewed without reference to the legislative history or whether the Act is viewed in light of the legislative history, the conclusion is the same: Section 20409 of the Act does not apply in these cases because these cases are certified as class-action lawsuits.

### C.

■ Finally, even if the Act applied to these cases generally, there was sufficient specific evidence in the record as to each plaintiff (whether named or unnamed) to justify the remedial order which will be issued in these cases.

For example, at the liability stage of these cases, the court found as fact that (1) within three days of his transfer to a double cell in one of the four main housing units, named plaintiff Jensen "was awakened by Svitak [Jensen's cellmate] punching him in the face," *Jensen*, 807 F.Supp. at 1473; (2) five of inmate Hart's cellmates "checked into protective custody" because of their fear of being assaulted, *id.* at 1475; (3) "violent cellmate confrontations are routine," *id.*; (4) the "practice of double celling is, of course, the primary factor leading to violent attacks by a

---

**3.** This is hardly remarkable.

**4.** As the United States Court of Appeals for the Eleventh Circuit recently observed, "[i]ndications of congressional intent contained in a conference committee report deserve great deference by courts because 'the conference report represents the final statement of terms agreed to by both houses, [and] next to the statute itself it is the most persuasive evidence of congressional intent.' " *RJR Nabisco, Inc. v. United States*, 955 F.2d 1457, 1462 (11th Cir.1992) (quoting *Demby v. Schweiker*, 671 F.2d 507, 510 (D.C.Cir.1981)).

cellmate on a cellmate," *id.;* (5) the "amount of violence and threatened violence as well as the presence of the factors that fuel them [in the four main housing units] are sufficient to conclude that a pervasive risk of harm exists in the four main housing units, a risk of such magnitude as to put Defendants on notice of its existence," *id.* at 1483; and (6) "the evidence supports a finding of deliberate indifference on the facts presented on the part of defendants in failing to use the classification information available to them in placing newly arriving inmates in double cells" because "[t]o randomly place newly arriving inmates into double cells under the volatile conditions that exist in the four main housing units is not a reasonable response to the pervasive risk of harm." *Id.* at 1483–84.

■ Thus, there were sufficient specific findings about *each* plaintiff (whether named individually or described by class) to satisfy the requirement of section 20409(a)(1) that the plaintiffs prove "the crowding causes the infliction of cruel and unusual punishment *of that inmate*" (emphasis added). There is nothing in the Act which prohibits a court from concluding that the trial evidence is sufficient to establish an Eighth Amendment violation regarding every member of a class even though the court may not (and probably would not) know the name of each class member.

Moreover, the relief chosen by the court does not employ an inmate population ceiling. In addition, the relief ordered is specifically limited so that it does not extend any further than necessary to remove the conditions causing the cruel and unusual punishment to each of the aggrieved inmates (whether named or described by class). Therefore, the remedy employed by the court is consistent with section 20409(a)(2) & (b)(1) of the Act.

**D.**

In summary, (1) section 20409 of the Act does not apply to these cases because overcrowding is not the basis for the court's injunctive relief; (2) section 20409 of the Act does not apply to these cases because they involve a class action; and (3) even if section 20409 were applied to the facts of these cases, the facts are sufficiently particularized as to each of the plaintiffs (whether named individually or described by class) to satisfy the provisions of section 20409(a), and the remedy chosen complies with the provisions of section 20409(b).

**II. ATTORNEY FEES**

I turn next to the plaintiffs' motion for attorney fees and costs. The plaintiffs request fees of approximately $321,705.38 and expenses of $10,321.83. As previously indicated, I shall award the plaintiffs attorney fees in the amount of $168,543.27, together with expenses of $10,321.83.

**A.**

The application for allowance of attorney fees and expenses (Filing 252) was submitted to the court on September 16, 1994, and supplemented in October, 1994. The application is supported by the following evidentiary materials:

1. Evidence Index (Filing 253) containing affidavit of Gregory D. Barton and attached exhibits, affidavit of Jack L. Shultz, affidavit of Tim Engler, affidavit of Robert W. Shively and exhibits, affidavit of Scott D. Freese and exhibit, and affidavit of Barry L. Hemmerling and exhibit.

2. Affidavit of Fredric H. Kauffman, president of the Nebraska State Bar Association (Filing 254, Exhibit A).

3. Second Supplemental Evidence Index (Filing 259) containing supplemental affidavit of Gregory D. Barton.

The plaintiffs' request for fees in the approximate sum of $321,705.38 is based on the following formula: (1) number of hours reasonably expended (2,593.23), multiplied by various *historic* hourly rates charged by the lawyers and paraprofessionals, producing a fee of $191,108.50; (2) plus an enhancement for delay in payment (bringing the fee to $214,470.25 if current billing rates are used); (3) with the total ($214,470.25) multiplied by a factor of 1.5 to account for exceptional service and excellent results.

The defendants submitted a detailed response. (Filing 263.) Among other things,

the defendants argue that the plaintiffs failed to account for unnecessary duplication of effort, submitted claims without necessary documentation, and failed to exclude fees attributable to unsuccessful claims. As a result, the defendants believe an across-the-board reduction of at least 75 percent should be made to reflect the inadequate documentation, duplication of effort, and limited nature of relief.

### B.

In order to understand the context in which this fee dispute arises, a review of the status of these cases is appropriate.

These cases began in 1987; they were ultimately consolidated and the class action was certified. Four law firms were initially involved: (1) the firm of Harding & Ogborn, (2) attorney Robert W. Shively and his associates, (3) attorney Barry L. Hemmerling and his associates, and (4) attorney Scott D. Freese. When the court denied the defendants' motion to remove three of the four firms, counsel for the plaintiffs were specifically advised, (Filing 83), that the court would expect detailed and precise time records from each attorney, as well as complete, documented justification for duplicate services.

These cases involve a class of inmates at NSP. According to counsel for the plaintiffs, the class consists of more than 500 individuals. As the Honorable William G. Cambridge, United States District Judge, noted while these cases were assigned to him, the plaintiffs asserted two claims:

> The Plaintiffs' main claim is that the practice of double-celling violates the Eighth Amendment cruel and unusual punishment clause, a claim that rests on challenges to numerous particular conditions of the Plaintiffs' confinement within double cells. The Plaintiffs' other claim is that the penitentiary's policy relating to inmate liability for contraband found in a double cell violates the Fourteenth Amendment due process clause.

*Jensen,* 807 F.Supp. at 1466.

The matter was tried to United States Magistrate Judge David L. Piester over a five-week period from August 16, 1991, through September 22, 1991. Eighteen trial days were consumed.

On June 11, 1992, Judge Piester filed a report and recommendation in which he found that:

1. The NSP rule presuming that each inmate in a living unit has knowledge of the presence of contraband found in the living unit was not per se unconstitutional under the Fourteenth Amendment's due process clause.

2. The evidence was insufficient to support the inmates' contention that double-celling had taxed the state penitentiary beyond its limits to provide essential human services, resources, and adequate physical structures to house inmates.

3. The random placement of newly arrived inmates in double cells under the volatile conditions that existed in the penitentiary's main housing units was not a reasonable response to the pervasive risk of harm to those inmates; therefore, such placement violated the Eighth Amendment.

4. NSP's informal practice of double-celling long-term inmates did not give rise to a substantial threat of harm in violation of the Eighth Amendment prohibition against cruel and unusual punishment.

5. Penitentiary officials in their individual capacities were entitled to qualified immunity from claims for damages with regard to random placement of the newly arrived inmates in double cells.

6. The Eleventh Amendment barred consideration of damages against penitentiary officials in their official capacities arising out of random placement of newly arrived inmates in double cells.

7. Inmates were entitled to prospective injunctive relief after showing that the penitentiary officials' practice of randomly placing newly arrived inmates in double cells presented a real and immediate threat of violence and thus violated the Eighth Amendment.

On September 9, 1992, Judge Cambridge, to whom these cases were then assigned, entered a memorandum opinion and order

adopting the magistrate judge's report and recommendation in all respects. Judge Cambridge then gave the defendants 90 days to submit a proposed remedial plan.

Rather than preparing and submitting a remedial plan, the defendants appealed to the United States Court of Appeals for the Eighth Circuit on October 9, 1992. Although the plaintiffs contended the defendants' appeal was premature, the plaintiffs timely filed a precautionary cross-appeal, filing their notice of appeal on October 21, 1992, and their amended notice of appeal on October 23, 1992.

On April 12, 1993, oral argument was heard before the United States Court of Appeals for the Eighth Circuit. Eighteen days later, on April 30, 1993, the court of appeals decided that the defendants' appeal was premature and jurisdictionally defective. *El–Tabech v. Gunter,* 992 F.2d 183 (8th Cir. 1993).

On August 9, 1993, an emergency hearing was held before me to consider the plaintiffs' request for a temporary restraining order and a preliminary injunction. At that time, these cases were still assigned to Judge Cambridge, but I handled the hearing in his absence.

Since no remedial plan had yet been offered by the defendants, and a new housing unit at NSP was about to be occupied by inmates, the plaintiffs contended there was an emergency. At the close of the hearing, I entered a preliminary injunction in favor of the plaintiffs, with the agreement of all parties, "without prejudice to a permanent injunction more expansive in character." At that time, I also directed the defendants to file and serve a proposed remedial plan, specifically finding that the plaintiffs had prevailed on the merits. (Filing 211, at 2.)

The defendants submitted their proposed remedial plan on August 16, 1993, and an amended proposed remedial plan on September 1, 1993. Thereafter, counsel for the plaintiffs reviewed the plan, sought and obtained the assistance of an expert to advise

them, and submitted a response on September 22, 1993.

On March 17, 1994, I referred these cases to Magistrate Judge Piester for consideration of the proposed remedial plan. At that time, I indicated that I would defer consideration of the attorney-fee issue.[5]

On March 22, 1994, Magistrate Judge Piester entered a memorandum and order in which he rejected various challenges by the plaintiffs to the defendants' proposed remedial plan but agreed with the plaintiffs that the defendants' attempt to leave an "escape clause" in their remedial plan posed a serious problem. Following this order, the defendants submitted a motion for leave to amend the proposed remedial plan, the purpose of which was to delete the objectionable "escape clause" from the proposed plan. On May 4, 1994, Magistrate Judge Piester entered his report, order and recommendation recommending adoption of the defendants' proposed plan, as amended.

On May 18, 1994, the plaintiffs filed objections in part to Judge Piester's report, order and recommendation of May 4, 1994. At the same time, the plaintiffs filed a separate motion for reconsideration of two of Judge Cambridge's findings regarding liability. By memorandum and order of July 25, 1994, I directed the parties to submit simultaneous briefs addressing the applicability of *Farmer v. Brennan,* —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The parties' initial briefs and reply briefs were ultimately submitted on or before August 12, 1994.

On August 23, 1994, I entered a memorandum and order (1) granting in part and denying in part the plaintiffs' objections to Magistrate Judge Piester's report, order and recommendation of May 4, 1994; (2) adopting in part and rejecting in part the magistrate judge's report and recommendation; (3) denying the plaintiffs' motion for reconsideration without reaching the merits; (4) setting forth the parameters of the permanent injunctive relief to be granted in favor of the plaintiffs; and (5) establishing a schedule for resolution of the attorney-fee issue.

---

**5.** The United States Court of Appeals for the Eighth Circuit remanded the fees attributable to the appeal to this court for consideration. (Filing 203.)

On September 9, 1994, I advised the parties of the provisions of section 20409 of the Violent Crime Control and Law Enforcement Act of 1994 and requested that any party seeking relief under the Act should file a motion within seven days of the date of the order. The defendants filed the motion which I resolved in Part I of this memorandum and order.

### C.

Section 1988 of Title 42 of the United States Code provides for an award of attorney fees to prevailing parties in litigation such as that before the court. In 1983, attorney-fee disputes were consuming substantial judicial resources. Accordingly, the United States Supreme Court issued its seminal opinion in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), stating that "[t]he standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" *Id.* at 433 n. 7, 103 S.Ct. at 1939 n. 7. In *Hensley*, the Court specifically warned lower courts not to permit fee requests to spawn "a second major litigation." *Id.* at 437, 103 S.Ct. at 1941. Following the Supreme Court's opinion in *Hensley*, the Federal Judicial Center published a comprehensive examination of the issue of attorney fees. Alan Hirsch & Diane Sheehey, *Awarding Attorneys' Fees and Managing Fee Litigation* (Federal Judicial Center 1994) [hereinafter *"Awarding Attorneys' Fees"*].

Having carefully considered *Hensley*, the precedents which followed it, and *Awarding Attorneys' Fees*, I shall now endeavor to address the specific issues presented by this fee application.

### 1.

■ The first issue to be considered in an attorney-fee case is whether an award of any kind is in order. There is no question that an award is in order in these cases.

The plaintiffs' application for attorney fees is timely, and the plaintiffs are the prevailing parties. They prevailed on a significant claim, and injunctive relief will issue, affording some of the relief sought. *See Texas Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989). Moreover, there are no special circumstances which would justify this court's refusal to award attorney fees. *See, e.g., Blanchard v. Bergeron*, 489 U.S. 87, 89 n. 1, 109 S.Ct. 939, 942 n. 1, 103 L.Ed.2d 67 (1989) (quoting *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)).

### 2.

What constitutes attorney fees is not always evident. While it is clear that fees for lawyers are included in such an award, it is not obvious that the fees of others are also included.

■ The Supreme Court has decided that fees for paralegal and law-clerk work should be allowed at the rates billed to clients for such services if that is the practice in the relevant market. *Missouri v. Jenkins*, 491 U.S. 274, 285, 287–88 & n. 9, 109 S.Ct. 2463, 2470, 2471 & n. 9, 105 L.Ed.2d 229 (1989). Thus, any component of an attorney-fee award should also include an amount equivalent to what the law firms would customarily bill clients for the work of paralegals and law clerks, provided, of course, that it is the practice in the relevant market to bill such services to clients.

As established by the affidavits filed in these cases, it is the practice in Lincoln, Nebraska, and the practice of the lawyers submitting this fee application, to bill clients (at rates exceeding the cost to the law firm) for the work of paralegals and law clerks. Indeed, that is the practice in most urban areas in the State of Nebraska. *See, e.g., Lutheran Medical Ctr. v. Contractors, Laborers, Teamsters & Engineers Health & Welfare Plan*, 814 F.Supp. 799, 805 n. 5 (D.Neb.1993), *aff'd*, 25 F.3d 616 (8th Cir. 1994) (stating "[t]he rates for the law firm's nonprofessional employees, including paralegals, librarians, and law clerks, were between $60–$65 an hour. These are customary charges in the relevant economic market.").

The same principle applies to out-of-pocket expenses; that is, if an out-of-pocket expense is normally billed to fee-paying clients in the relevant economic market, then such ex-

penses are a proper component of an attorney-fee award. *Awarding Attorneys' Fees* at 18–19 & n. 83. The evidence in these cases establishes that the expenses claimed are the type customarily billed to fee-paying clients in the relevant economic market.

### 3.

■ The Supreme Court established in *Hensley* that the award in fee-shifting cases is based upon the so-called "lodestar." 461 U.S. at 433. The lodestar is calculated by determining the number of hours reasonably expended, multiplied by the applicable hourly *market* rate for the relevant legal services. *Id.*[6]

■ The reasonable rate is determined by reference to the marketplace. *Missouri v. Jenkins*, 491 U.S. 274, 285, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989) ("[W]e have consistently looked to the marketplace as our guide to what is 'reasonable.'"). As the Court also noted, the marketplace takes into account variations in the skill and experience of attorneys. *Blum v. Stenson*, 465 U.S. 886, 895–96 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984).

■ With respect to hours reasonably expended, that is ultimately a judgment for the court. The issue, however, "is not whether hindsight vindicates an attorney's time expenditures, but whether at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Awarding Attorneys' Fees* at 24–25 n. 116 (quoting *Grant v. Martinez*, 973 F.2d 96, 99 (2nd Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993)).

The Supreme Court made it clear that counsel are required to exercise billing judgment and that district courts are required to exclude from initial fee calculations hours that were not reasonably expended, including excessive, redundant, or otherwise unnecessary work. *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939–40.

■ The documentation required to support a fee application varies from circuit to circuit. *Awarding Attorneys' Fees* at 25. In the Eighth Circuit, determining the adequacy of the records is largely left to the discretion of the trial court. *Awarding Attorneys' Fees* at 26 n. 125 (citing *MacDissi v. Valmont Indus.*, 856 F.2d 1054, 1061 (8th Cir.1988)).

■ When calculating the lodestar, it is important to recognize that a number of things are subsumed within it. Most of the time, reductions for insufficient documentation and the like are to be included in the calculation of the lodestar. *Awarding Attorneys' Fees* at 35. Moreover, in the Eighth Circuit, the novelty or difficulty of the case should be included when calculating the lodestar rather than used as an enhancement. *Awarding Attorneys' Fees* at 36 (citing *Hendrickson v. Branstad*, 934 F.2d 158, 163 (8th Cir.1991)).

■ Finally, the Supreme Court has stated that a trial court may in its discretion compensate the award recipient for a delay in payment. This can be achieved by calculating the lodestar in current dollars, which is my practice. *See, e.g., Missouri v. Jenkins*, 491 U.S. at 284, 109 S.Ct. at 2469.

### 4.

I now turn to the calculation of the lodestar.

#### a.

I shall first examine what is a reasonable hourly rate when viewed at current market rates. As I noted before, "this court customarily approves hourly rates ranging from $85–$105 per hour" in civil-rights cases. *Lutheran Medical Ctr.*, 814 F.Supp. at 805. I

---

6. While many courts continue to use the so-called "*Johnson* factors" (as this court does from time to time), "*Hensley* makes clear that these factors matter only as they bear on the market rate or hours reasonably expended, or, in rare cases, if they are a basis for adjusting the lodestar." *Awarding Attorneys' Fees* at 19 n. 84. I have considered each and every "*Johnson*" factor in arriving at my decision. Those factors are: (1) time and labor required; (2) novelty and difficulty of issues; (3) skill required; (4) loss of other employment; (5) customary fee; (6) whether fee is fixed or contingent; (7) time limitations imposed by client or circumstances; (8) amount involved and results obtained; (9) counsel's experience, reputation, and ability; (10) undesirability of case; (11) nature and length of relationship with clients; and (12) awards in similar cases. *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717 (5th Cir.1974).

believe that range is applicable in these cases and is an accurate reflection of what the market charges in or about Lincoln, Nebraska, for civil-rights litigation of the type involved here. Accordingly, I have applied that rate range to these cases.

■ A number of comments are in order regarding the specific market rates I employed. Initially, I observe that the law firm of Harding & Ogborn was, at least informally, designated as "lead counsel" in these cases. Virtually all of the brief writing, which was very substantial and extremely important, was handled by Harding & Ogborn, and more than 54 percent of the time involved in these cases was expended by the Harding & Ogborn firm. The legal issues in these cases were both complex and difficult, and the cases were of long duration. The legal services rendered by Harding & Ogborn were first-rate and conferred upon the plaintiffs a very substantial benefit. Accordingly, I have used a market rate of $105 per hour for the lawyers at Harding & Ogborn, multiplied by the number of hours reasonably expended by each.[7]

■ I used the low end of the market range ($85 per hour) for all other counsel for a number of reasons. With the exception of attorney Robert Shively, the current market rate for all the other lawyers who billed time on these cases is $85 or less.[8] Thus, my utilization of the $85–per–hour rate is but-

tressed by the lawyers' own estimation of their skills.[9] Moreover, because of the disproportionate responsibility assumed by lead counsel, it is a reflection of the market to compensate nonlead counsel at comparably reduced rates.

With regard to Mr. Shively, I do not doubt that his current rate of $95 per hour is generally reasonable, but in these cases, where he did not serve as lead counsel, it is appropriate to limit his rate to $85 per hour. I reached this conclusion for two related reasons: (1) Mr. Shively's billing rate was only recently increased to $95 per hour; and (2) in comparison to other nonlead counsel, Mr. Shively did not assume a significantly different or more difficult role in these cases.

Although Mr. Freese's current billing rate is $75 per hour, I believe it appropriate to compensate him at the rate of $85 per hour for two reasons: (1) Mr. Freese practices primarily in rural Nebraska and thus his current billing rate does not reflect the value of his services in the relevant economic market, i.e., federal practice in Lincoln, Nebraska; and (2) in comparison to other nonlead counsel, Mr. Freese did not assume a significantly different or smaller role in these cases.

■ As noted earlier, the so-called *Johnson* factors are subsumed in the lodestar calculation. *Awarding Attorneys' Fees* at 19 n. 84. This is nothing more than a recogni-

---

7. I recognize that the $105–per–hour rate is slightly higher than Mr. Barton's current billing rate of $100 per hour. However, I believe I have discretion to use the high end of the market range. *Awarding Attorneys' Fees* at 21 n. 92 (citing *Shakopee Mdewakanton Sioux Comm. v. City of Prior Lake*, 771 F.2d 1153 (8th Cir.1985), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1185, 89 L.Ed.2d 301 (1986)). Mr. Barton and his firm displayed excellent legal ability throughout this matter, and these cases were of sufficient complexity and duration to justify an award at the high end of the market rate for lead counsel who assumed a larger than pro rata share of the responsibility for the prosecution of these cases. In this connection, I note that if I use a weighted average for the current billing rates of all three lawyers who billed for Harding & Ogborn, the weighted effective average current billing rate (approved hours multiplied by individual billing rates divided by total approved hours for Harding & Ogborn lawyers billing in these cases) is about $102 per hour (before reduction for

"incomplete success" but after the court's determination of the number of hours reasonably expended) (Barton at $100; Mickle at $110 (the assumed rate, as Mr. Mickle is now an assistant United States attorney); and Cox at $140). Thus, the $105–per–hour rate is not significantly higher than the weighted effective average current billing rate for all members of the firm.

8. All nonlead counsel currently bill at $85 per hour except Mr. Shively and Mr. Freese. Shively currently bills at $95 per hour, and Freese currently bills at $75 per hour.

9. The weighted effective average current billing rate (approved hours multiplied by individual current billing rates divided by total approved hours for all nonlead counsel) for these lawyers was about $87 per hour (before reduction for "incomplete success" but after the court's determination of the number of hours reasonably expended).

tion that normally the rates lawyers currently charge fee-paying clients are a good guide to what those same lawyers should be paid by virtue of an attorney-fee award. *Id.* at 20–21 ("Courts all agree that an attorney's customary billing rate is the proper starting point for calculating fees."). Nevertheless, three so-called *Johnson* factors should be highlighted, although all such factors have been considered.

It is useful to consider counsel's experience, reputation, and ability. Primary lead counsel for the plaintiffs (Mr. Barton) graduated with distinction from the University of Nebraska College of Law in Lincoln, Nebraska. He was executive editor of the Nebraska Law Review. He was a member of the College of Law's national trial advocacy team. He has practiced law for the past six years and is a member of the Nebraska State Bar Association, the Lincoln Bar Association, the Association of Trial Lawyers of America, and the Nebraska Association of Trial Attorneys. (Filing 253, Barton Aff. at 2, ¶ 2.)

In this connection, I especially note the affidavit of Fredric H. Kauffman, president of the Nebraska State Bar Association and a competitor of the plaintiffs' lead counsel. Mr. Kauffman has approximately 29 years' experience trying cases and is a fellow of both the American College of Trial Lawyers and the International Society of Barristers. Mr. Kauffman opines that the current and historic rates charged by lead counsel in this case are "well within the range of reasonableness for the Lincoln, Nebraska area." (Filing 254, Kauffman Aff. at 2–3.) According to Mr. Kauffman, his opinion is "based upon my prior experience and familiarity with the practice of law in this area and my experience with Mr. Barton [lead counsel] in federal court litigation which was highly complex, both factually and legally." (*Id.* at 3.)

In sum, the lawyer and the law firm that served as lead counsel in these cases are both well regarded, and the rate of $105 per hour, consistent as it is with the rates currently charged fee-paying clients by these lawyers in the relevant economic market, appears fully justified.

Associate counsel in these cases likewise have good experience, reputations, and abilities consistent with the lodestar rates used to compensate them. For example, Mr. Hemmerling graduated from law school in 1976, currently maintains a general practice, and is rated "BV" by the Martindale–Hubbell Law Directory. (Filing 253, Hemmerling Aff. at 1–2, ¶ 4.) Mr. Freese has been admitted to practice law since 1983, was elected to the moot court board while in law school, maintains a general-litigation practice in Norfolk, Nebraska, and teaches at a community college part-time. (Filing 253, Freese Aff. at 3–4, ¶ 5.) Mr. Shively was admitted to the bar in 1985. He graduated from the University of Nebraska College of Law, where he was a member of the national trial advocacy team. His practice is almost entirely in the area of civil litigation. He is a member of the Nebraska State Bar Association, served four years on the Executive Committee of the Young Lawyers Section of the Nebraska State Bar Association, and was vice chair of the Young Lawyers Section in 1992–93. He served as district representative for the Young Lawyers Division of the American Bar Association in 1993–94. (Filing 253, Shively Aff. at 2, ¶ 4.)

I also believe it helpful to recognize the nature and length of counsel's relationship with the clients in these cases. Counsel for the plaintiffs were appointed in 1987. They have served a large and diverse group of prison inmates for approximately seven years. In addition, they acted as "class counsel." Thus, the nature and length of the representation in these cases should be considered extraordinary, both in terms of responsibility to a large number of plaintiffs and sheer duration of the cases.

In this regard, I note that during the period of time these lawyers represented the plaintiffs, there was virtually no money available to fund the out-of-pocket expenses reasonably incurred by counsel in the prosecution of these cases. Aside from a $1,000 contribution from the federal practice fund, out-of-pocket expenses had to be advanced by counsel for the plaintiffs with no hope of reimbursement if they did not prevail. Quite apart from the financial drain on counsel which can now be compensated, this lack of

expense money undoubtedly made counsel's job unusually difficult.

Still further, I am satisfied that these cases were sufficiently complex and difficult to warrant the lodestar rates used, particularly insofar as lead counsel is concerned. Comparatively speaking, this prisoner civil-rights case was more difficult than average. The advocacy skills displayed by lead counsel, particularly in the many briefs submitted to this court and the court of appeals, were equal to the complex and difficult task confronting counsel. Thus, the complexity and difficulty of these cases warrant a higher-than-average lodestar rate for lead counsel.

Finally, I should explain how I determined the appropriate rate for law clerks and paralegals. I took the current rates billed by each firm for its law clerks [10] and paralegals [11] and applied that current billing rate to the approved number of hours. I note that the rates I employed are substantially below the $60–$65 per hour I found reasonable in *Lutheran Medical Ctr.*, 814 F.Supp. at 805 n. 5.

**b.**

█ In calculating the number of hours reasonably expended on these cases, a number of observations should be made. Initially, it must be observed that this matter spanned seven years and involved 18 trial days, a premature appeal to the United States Court of Appeals for the Eighth Circuit that was fully briefed and argued, and protracted litigation regarding the contours of injunctive relief. Simply put, these were time-intensive cases of long duration. Thus, the claim of plaintiffs' counsel to have expended 2,593.23 hours does not seem out of line.

If one compares these cases with published cases of similar complexity but less trial

time, such a comparison supports the number of hours claimed by counsel for the plaintiffs. For example, consider the case of *Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.*, 812 F.Supp. 966 (D.Neb.1993), *aff'd in relevant part*, 19 F.3d 431 (8th Cir.1994), which involved a six-day jury trial where counsel claimed to have expended 928 hours and where opposing counsel said the case could have been litigated in 500 hours or less. I approved fees based on a total of 876 hours.

If a reasonably complex case that took six days to try to a jury is any measure, a reasonably complex 18–day trial to the court, followed by a premature appeal and extensive hearings on the scope of the remedy, could certainly generate the 2,593.23 hours claimed by counsel for the plaintiffs in these cases. Indeed, if one simply made a linear projection of the number of hours approved in *Johnson Int'l Co.* multiplied by the number of days of trial in these cases, one would find that more than 2,600 hours could reasonably have been expended in these cases.

Recognizing that jury trials are viewed by some as substantially different from trials to the court, it is also appropriate to consider published opinions dealing with trials to the court in the relevant market. In *Lutheran Medical Ctr.*, 814 F.Supp. 799, the court was confronted with commercial litigation tried to the court over a period of five days. The court approved fees based on the expenditure of 676 hours by seven lawyers, two law clerks, a professional librarian and two paralegals.

Once again, using nothing more than a linear projection from *Lutheran Medical Ctr.*, if a relatively complex five-day nonjury case can reasonably generate 676 hours, a relatively complex 18–day nonjury case, followed by a premature appeal and extensive

---

**10.** In the case of Harding & Ogborn, where there are split rates for law clerks, I used the higher of the two rates because there were times when a law clerk who would have been billed at one rate was entitled to a higher rate by the time the case was ripe for resolution of the fee issue. Thus, it seemed appropriate to me to use the higher of the two rates to account for delay in payment. In any event, the law-clerk rate is still substantially less than the rates found reasonable in *Lutheran Medical Ctr.* In this connection, I note that for purposes of this type of litigation, partic-

ularly given the size and expertise of the Harding & Ogborn firm, it is perfectly appropriate to consider the Omaha, Nebraska, market and the Lincoln, Nebraska, market in federal court as constituting the same relevant market.

**11.** Contrary to the suggestions of the defendants, the current rate for Harding & Ogborn paralegals is $55 per hour, not $50. (Filing 259, Supplemental Ex. 1.)

hearings on the scope of the remedy, could certainly generate the 2,593.23 hours claimed by the plaintiffs' counsel in these cases.[12]

I do not wish to be misunderstood with regard to my citations to *Johnson Int'l Co.* and *Lutheran Medical Ctr.* I tried both cases and am intimately familiar with them. I do not cite them in support of the proposition that they are analogous to these cases. *Johnson Int'l Co.* was an insurance-contract case, and *Lutheran Medical Ctr.* was an ERISA case. However, in my judgment, both are of sufficiently similar complexity (regardless of the nature of the dispute) to profitably warrant comparison for purposes of measuring whether the claim of the plaintiffs' counsel to have spent 2,593.23 hours on these cases is reasonable. After applying *Johnson Int'l Co.* and *Lutheran Medical Ctr.* to these cases, I am satisfied that the claim of 2,593.23 hours submitted by counsel for the plaintiffs is quite reasonable.

Notwithstanding my conclusion that 2,593.23 hours *could* have been reasonably expended on these cases, I have reduced the hours claimed by 10 percent. I did so because although the documentation submitted by the plaintiffs' counsel was voluminous, detailed, and, in most cases, fully in compliance with our local rules of practice, there were certain instances where the documentation was simply not sufficient to make an intelligent determination as to whether the hours expended were in fact reasonable. Counsel for the defendants did a good job of highlighting some of these problems in their very detailed response. While I certainly do not agree with all of the complaints of the defendants' counsel, some of them do have merit. In particular, it is sometimes difficult to determine whether the services rendered were necessary (e.g., was the research that was done actually used), and it is sometimes difficult to determine whether the services rendered by more than one counsel unnecessarily duplicated the work of other counsel. A 10–percent "across-the-board" reduction is my best judgment of the number of hours that should be deducted from the hours claimed in order to estimate the number of hours reasonably expended in these cases.

Accordingly, I have calculated the lodestar this way: (1) Total hours allowed for lawyers: 1,882.07, with a weighted effective rate [13] for lawyers of $95.80 per hour; (2) total hours allowed for law clerks: 311, with a weighted effective rate for law clerks of $40.04 per hour; and (3) total hours allowed for legal assistants: 140.85, with a weighted effective rate for legal assistants of $39.29 per hour. The net result is that I have allowed 2,333.92 hours, with a weighted effective rate for all lawyers, law clerks, and legal assistants of $84.95 per hour, for a lodestar fee of $198,286.20. A summary of these calculations follows:

### SUMMARY

| | |
|---|---|
| Total hrs. claimed: | 2,593.23 |
| Total hrs. allowed: | 2,333.92 |
| Total fees allowed: | $198,286.20 |
| Weighted effective rate/all: | $ 84.95 |
| | |
| Total hrs. claimed for lawyers: | 2,091.18 |
| Total hrs. allowed for lawyers: | 1,882.07 |
| Total fees allowed for lawyers: | $180,300.75 |
| Weighted effective rate/lawyers: | $ 95.80 |

12. Lead counsel in this case, Mr. Barton, has experience and education very similar to that of lead counsel in *Lutheran Medical Ctr.* Moreover, the firm of Harding & Ogborn is similar in size and nature of practice to lead counsel's firm in *Lutheran Medical Ctr.*

13. "Weighted effective rates" are calculated by multiplying the approved hours times the market or approved rates divided by the total number of hours for the particular class of timekeeper being examined. For example, if one wanted to know the weighted effective rate for lawyers, one would multiply the number of hours approved for each lawyer times the rate approved for each lawyer, total the product of each such exercise, and divide that sum by the total number of approved hours for all lawyers.

| | | |
|---|---|---|
| Total hrs. claimed for law clerks: | | 345.55 |
| Total hrs. allowed for law clerks: | | 311.00 |
| Total fees allowed for law clerks: | $ | 12,451.70 |
| Weighted effective rate/law clerks: | $ | 40.04 |
| Total hrs. claimed for legal assistants: | | 156.50 |
| Total hrs. allowed for legal assistants: | | 140.85 |
| Total fees allowed for legal assistants: | $ | 5,533.75 |
| Weighted effective rate/legal assistants: | $ | 39.29 |

## SUMMARY PER FIRM

### Harding & Ogborn

| Professional | Hrs. Claimed | Hrs. Allowed | Market Rate * | Lodestar |
|---|---|---|---|---|
| Barton/Mickle | 1,121.95 | 1,009.76 | $105.00 | $106,024.80 |
| Cox | 7.20 | 6.48 | $105.00 | $ 680.40 |
| Law Clerk | 231.50 | 208.35 | $ 45.00 | $ 9,375.75 |
| Legal Assistant | 42.75 | 38.47 | $ 55.00 | $ 2,115.85 |
| | 1,403.40 | 1,263.06 | | |

Total for Firm: $118,196.80 **

### Shively

| Professional | Hrs. Claimed | Hrs. Allowed | Market Rate * | Lodestar |
|---|---|---|---|---|
| Shively | 377.70 | 339.93 | $ 85.00 | $ 28,894.05 |
| Tushar | 101.50 | 91.35 | $ 85.00 | $ 7,764.75 |
| Law Clerk | 76.30 | 68.67 | $ 25.00 | $ 1,716.75 |
| Legal Assistant | 38.50 | 34.65 | $ 40.00 | $ 1,386.00 |
| | 594.00 | 534.60 | | |

Total for Firm: $ 39,761.55 **

### Hemmerling

| Professional | Hrs. Claimed | Hrs. Allowed | Market Rate * | Lodestar |
|---|---|---|---|---|
| Hemmerling | 262.25 | 236.03 | $ 85.00 | $ 20,062.55 |
| Law Clerk | 37.75 | 33.98 | $ 40.00 | $ 1,359.20 |
| Legal Assistant | 75.25 | 67.73 | $ 30.00 | $ 2,031.90 |
| | 375.25 | 337.74 | | |

Total for Firm: $ 23,453.65 **

### Freese

| Professional | Hrs. Claimed | Hrs. Allowed | Market Rate * | Lodestar |
|---|---|---|---|---|
| Freese | 220.58 | 198.52 | $ 85.00 | $ 16,874.20 |

Total for Firm: $ 16,874.20 **

* The historic rates for Barton ranged from $75 to $100 per hour. The historic rates for Mickle (who left Harding & Ogborn to become an Assistant United States Attorney in approximately 1989) ranged from $70 to $80 per hour. The historic rate for Cox was $140 per hour. The historic rates for Shively ranged from $65 to $95 per hour. The historic rates for Tushar ranged from $65 to $85 per hour. The historic rates for Hemmerling ranged from $60 to $85 per hour. The historic rates for Freese ranged from $65 to $75 per hour. The historic rates for law clerks at Harding & Ogborn ranged from $40 to $45 per hour, and the historic rates for legal assistants ranged from $50 to $55 per hour. The historic rate for law clerks working with Shively was $25 per hour, and the historic rates for legal assistants ranged from $35 to $40 per hour. The historic rate for law clerks working with Hemmerling was $40 per hour, and the historic rates for legal assistants ranged from $10 to $30 per hour. Freese did not engage law clerks or legal assistants to work on these cases.

** Harding & Ogborn's claim for fees *before* reduction in allowable hours, *before* application of market rates, and *before* utilization of 1.5 enhancement was $110,478.75.

Shively's claim for fees *before* reduction in allowable hours, *before* application of market rates, and *before* utilization of 1.5 enhancement was $41,359.50.

Hemmerling's claim for fees *before* reduction in allowable hours, *before* application of market rates, and *before* utilization of 1.5 enhancement was $23,313.75.

Freese's claim for fees *before* reduction in allowable hours, *before* application of market rates, and *before* utilization of 1.5 enhancement was $15,956.50.

---

### 5.

Counsel for the plaintiffs argue that they are entitled to an enhancement for delay in payment. I do not doubt the point. In calculating the lodestar, I have addressed this factor by using the current rates I believe reasonable multiplied by the number of hours I believe reasonable. This method compensates counsel for any delay in payment. *Awarding Attorneys' Fees* at 38. In that regard, I note that these cases were quite extended in terms of length and the extended nature of the cases undoubtedly caused counsel significant difficulty by virtue of the delay in payment. I was sensitive to that fact when selecting appropriate market rates.

### 6.

Counsel for the plaintiffs also argue that their fees should be enhanced by a factor of 1.5 because they provided exceptional service and obtained excellent results. In this connection, I acknowledge that all the lawyers involved in this litigation, including defense counsel, were complimented by Magistrate Judge Piester for their trial work. Indeed, Judge Piester observed that "[t]he issues in this case were many and complex; their analysis and presentation required a nearly Herculean effort from counsel." *Jensen,* 807 F.Supp. at 1467 n. 1. Judge Piester commended counsel "for rising to the difficult challenges faced in bringing this case to a reviewable posture." *Id.*

Moreover, I agree with counsel for the plaintiffs that the result they obtained in these cases was quite a good one. Because of the efforts of the plaintiffs' counsel, the defendants will be required in their official capacities to safeguard the plaintiffs from the threat of violent attacks from cellmates by instituting written procedures to ensure that newly arrived inmates are not randomly placed in double cells under the extremely volatile conditions at NSP. Judge Piester's description of the problem provides both a statistical and anecdotal record of truly horrendous violence, *Jensen,* 807 F.Supp. at 1471–75, which fully justifies the injunctive relief which will be employed in these cases.

Notwithstanding the fact that counsel for the plaintiffs did a laudable job and obtained a good result, I must follow the clear direction of the Supreme Court, which frowns upon such enhancements. *Blum v. Stenson,* 465 U.S. at 899, 104 S.Ct. at 1549. Indeed, it is only in "a rare case" when "the success or quality transcends what can be expected given the hourly rates and number of hours expended, [that] the lodestar may be enhanced." *Awarding Attorneys' Fees* at 36–37 (footnote omitted).

The ultimate question when considering an enhancement is whether the market rate ought to be enhanced to ensure that quality counsel can be obtained to do quality work. I am satisfied that the lodestar rates used and the size of the final fee award are suffi-

cient to ensure that present and future counsel will not be afraid to take on cases such as these, do quality work, and obtain good results.

**7.**

The defendants vigorously argue that the billing statements submitted by counsel for the plaintiffs are not properly documented and that they include a tremendous amount of duplicative time. As indicated previously, I accept this argument to some degree. In fact, I have substantially reduced the number of hours claimed by the plaintiffs' counsel in recognition of this problem. I do not agree, however, that this difficulty warrants an even deeper reduction.

Initially, I observe that our local rules of practice set out fee application guidelines. *See* NELR § 83.14, at 785–86 (West 1994). Counsel for the defendants argue, with some justification, that from time to time counsel for the plaintiffs have not specifically complied with certain provisions of the fee application guidelines.

In contrast, one need only examine the voluminous submission of the plaintiffs' counsel to know that they endeavored to keep meticulous records and to comply with NELR § 83.14. As its title implies, NELR § 83.14 is a set of "guidelines." For services performed, the plaintiffs' counsel must "[i]dentify with particularity the work done." NELR § 83.14(a)(1). Likewise, for expenses, the plaintiffs' counsel must "[i]dentify the expense with particularity." NELR § 83.14(b)(1). The examples which follow each of these subsections of NELR § 83.14 are not, however, intended to be a straight jacket.

 Counsel seeking fees must identify with particularity the work done or the expenses incurred. However, counsel are not required to mindlessly follow the examples in NELR § 83.14 used by the court as an illustration. In these cases of seven years' duration, involving 18 trial days, an appeal, and extended litigation on the appropriateness of the remedy, I am satisfied, except as indicated above, that the plaintiffs' counsel have complied with the substance of NELR § 83.14. In this regard, I note that counsel

affirm they maintained contemporaneous time records throughout the lengthy period of their representation.

With regard to the issue of duplication, I am once again partially in agreement with the defendants' counsel. Certain time entries are inadequately documented, making it difficult to understand why co-counsel were required to perform what appears to be duplicative work. To the extent that I observed these problems, I believe I adequately addressed the concerns of counsel for the defendants by reducing the lodestar regarding the number of hours claimed by counsel for the plaintiffs.

Moreover, I note that the plaintiffs' counsel made a concerted effort to avoid duplication. Mr. Barton discussed this effort in great detail in his affidavit, describing the efforts of counsel with regard to pretrial and trial matters as follows:

> For the entirety of the case, every effort was made to avoid duplication or inefficiencies within and between firms. After January 1989, most of the attorney hours expended by my Firm were performed by me personally. In addition, there was little, if any, duplication among Plaintiffs' co-counsel. All co-counsel made every effort to limit the number of conferences for case strategy and coordination. Each attorney for Plaintiffs in this case had specific, assigned duties with regard to pretrial matters and with regard to witnesses and areas of examination at trial. These specific assignments eliminated duplication of effort by the four counsel for Plaintiffs. Granted, it was necessary for the attorneys to meet at times and discuss various strategies and approaches. A case of this size cannot be managed without some form of central control and coordination. Attorney Robert Shively served in the central coordinator role throughout the pre-trial phase. I was primarily responsible for conducting discovery. Mr. Freese was primarily responsible for matters relating to certification of and notification to, as well as ongoing communications with the class. Barry Hemmerling was responsible for technical areas of discovery relating to expert witnesses and the technical matters they were

expected to testify about, i.e., air flow, noise level readings, etc.

(Filing 253, Barton Aff. at 14–15, ¶ 18.)

Moreover, as Mr. Barton suggests, he and attorney Robert Shively made a concerted effort to eliminate duplicate claims before submitting the application for attorney fees. Mr. Barton states:

Robert Shively and I have gone through all co-counsel's respective summaries with a view toward eliminating duplication or inconsistency. We attempted to eliminate most, if not all, inconsistency in connection with the joint fee application. Although this case has gone on for approximately seven years, detailed time records were prepared by each attorney at the time the work was performed. Accordingly, the time entries were simultaneously created. Where a conference involved two or more attorneys, every effort was made by Robert Shively and me to reduce the time incurred. For example, if one attorney recorded more time for a conference or a telephone call than the other participating attorney or attorneys, the lower time was consistently used or one of the attorney's time was eliminated. In addition, to further avoid even an appearance of duplication, in many instances only one attorney's time has been submitted and the other participating attorney's time has not. Although Mr. Shively and I spent over 3 hours each in reviewing all co-counsel's respective summaries as above-described [sic]. Mr. Shively and I have not claimed any time for this review in Plaintiffs' Application.

(Id. at 15–16, ¶ 20.)

In addition, Mr. Barton indicates that his firm "wrote off" a substantial amount of hours and expenses in an effort to ensure that the application submitted was reasonable. For example, Mr. Barton points out that he wrote off more than 90 hours of attorney and law-clerk time which would have generated fees in excess of $9,200. (Id. at 16, ¶ 21.) Mr. Barton also indicates his firm wrote off more than $2,300 of secretarial and word-processing expenses that the firm customarily would have billed. (Id. at 19, ¶ 25.)

The affidavits of the other lawyers confirm Mr. Barton's testimony about efforts to use "billing judgment." Mr. Shively represents that he personally reviewed and edited the legal services provided by his law firm and made a concerted attempt to delete claims for duplicative effort. (Filing 253, Shively Aff. at 6, ¶ 11.) Similar efforts were made by Mr. Hemmerling (id., Hemmerling Aff. at 2, ¶ 6), and the affidavit of Mr. Freese displays sensitivity to concerns about duplication as well. (Id., Freese Aff. at 5–6, ¶ 10.)

In summary, the adequacy of documents submitted in support of an application for attorney fees ultimately rests on a case-by-case assessment of whether the court has a reliable basis upon which to award fees. *MacDissi v. Valmont Indus., Inc.,* 856 F.2d 1054, 1061 (8th Cir.1988) (affirming district court's conclusion that attorneys' reconstructed time records were sufficient to document their time, and that the time expended was reasonable in the context of the litigation). With the exception noted above, I am satisfied that the records submitted by counsel for the plaintiffs adequately document their efforts in such a way that I may make a reasonably reliable award of attorney fees.

### 8.

Defense counsel also argue that there should be a reduction in the lodestar due to partial success or incomplete success. As discussed more fully later, the concept of "partial success" relates to discrete claims, and the concept of "incomplete success" pertains to related claims.

I shall reduce the lodestar calculation by 15 percent to account for "incomplete success."

### a.

The claims of the plaintiffs were described by Judge Cambridge as being two in nature. The plaintiffs' first, or "main claim," was the practice of double-celling as a violation of the Eighth Amendment's cruel and unusual punishment clause. *Jensen,* 807 F.Supp. at 1466. According to Judge Cambridge, this claim was based upon "challenges to numerous particular conditions." *Id.* The plaintiffs' "other claim" was NSP's policy "relating to

inmate liability for contraband found in a double cell," which the plaintiffs contended violated the Fourteenth Amendment's due process clause. *Id.*

As noted previously, the plaintiffs prevailed on their "main claim" to the extent that they obtained injunctive relief "premised on the failure of the Defendants Hopkins and Clarke, in their official capacities, to safeguard the Plaintiffs from the threat of violent attacks by a cellmate." *Id.* In particular, Judge Cambridge and Magistrate Judge Piester found that the random placement of "newly arriving inmates into double cells under the volatile conditions that exist in the four main housing units is not a reasonable response to the pervasive risk of harm" and that injunctive relief should therefore be granted. *Id.* at 1484–85.

Judge Cambridge and Magistrate Judge Piester found that NSP's policy concerning contraband did not violate the Fourteenth Amendment, that an Eighth Amendment violation did not exist as to "long-term" inmates whose propensity for violence might be better known, and that the defendants had qualified immunity from damages in their individual capacities and Eleventh Amendment immunity from damages in their official capacities. *Id.* at 1479–80, 1484–85. The court also found that double-celling had not taxed NSP beyond its limits to provide essential human services, resources, and adequate physical structures. *Id.* at 1481. Judge Piester was also careful to point out, however, that his analysis of these conditions was also related to the Eighth Amendment challenge to double-celling as that challenge regarded violence. *Id.* at 1483.

It is helpful to have a clear understanding of the plaintiffs' claims. It is also helpful to have a clear understanding of the court's findings with regard to those claims.

Two claims were litigated in *Jensen:* (1) a Fourteenth Amendment due process claim regarding the rule on contraband as applied to double cells, and (2) an Eighth Amendment claim regarding double cells. The Eighth Amendment claim had two components: (a) double cells allegedly failed to provide essential human services, resulting in intolerable conditions, and (b) the practice of double-celling allegedly failed to protect inmates from the pervasive risk of violence.

The plaintiffs lost on their Fourteenth Amendment claim and on the first component of their Eighth Amendment claim. The plaintiffs won on the second component of their Eighth Amendment claim with regard to newly arrived inmates. The plaintiffs lost on the second component of their Eighth Amendment claim insofar as the claim pertained only to veteran inmates. Although there was a pervasive risk of violence to those inmates as well as to "newly arrived" inmates, the evidence was insufficient to find that NSP was not informally considering the available data when making double cell assignments where both inmates were "veterans."

**b.**

■ *Hensley* made it clear that when determining the issue of attorney fees, the court should consider whether the plaintiff was only "partially" successful. *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. Thus, "where the plaintiff advances discrete, essentially unrelated claims, and prevails on some but not others, it should not be compensated for work on the unsuccessful claims." *Awarding Attorneys' Fees* at 27–28 (footnotes omitted).

However, where the claims are interrelated, "in the majority of cases, courts have rejected the contention that the lodestar should be adjusted downward for unsuccessful claims, usually finding that the successful and unsuccessful claims were legally or factually intertwined or that counsel devoted most of its time to the litigation as a whole." *Id.* at 28 (footnote omitted).

The Court also indicated in *Hensley* that downward adjustments could be made for "incomplete" success. *Hensley,* 461 U.S. at 435–36, 103 S.Ct. at 1940–41. Therefore, "even if claims are closely related, or there is just one claim, a downward adjustment to the lodestar may be appropriate if the plaintiff achieved only limited success." *Awarding Attorneys' Fees* at 29 (footnote omitted). Where such a situation exists, "the gauge of success is the result of the lawsuit in terms of relief; there should not be a downward adjustment simply because not every argu-

ment or theory prevailed." *Id.* (footnote omitted).

In summary, *Hensley* suggests that a reduction in the lodestar may be justified in two different situations. The first is where there are truly different claims—for example, prison library policies are attacked for violating the equal protection clause of the Fourteenth Amendment and prison medical policies are attacked for violating the Eighth Amendment—and the plaintiff does not prevail on each of the different claims. The second is where the claims are related—for example, prison library policies and prison medical policies are attacked for violating the equal protection clause of the Fourteenth Amendment—and the plaintiff obtains relief which is limited to only part of the plaintiff's prayer for relief.

### c.

■ Initially, I find that all the claims in these cases were related, both legally and factually, and there is no justifiable basis for reducing the lodestar for only "partial" success. Thus, the fact that the plaintiffs did not prevail on their Fourteenth Amendment claim or the entirety of their Eighth Amendment claim is not, in my judgment, a justification for reduction of the lodestar. The claims were sufficiently related, both legally and factually, so that it would have been impossible to explore the core Eighth Amendment claim (placing inmates in double cells) without also examining the policy on contraband (as it applied to double cells) and the other components of the Eighth Amendment claim, such as noise, ventilation, correctional staff, intercom system, and the like (within the context of double cells). This interrelationship was made clear by Magistrate Judge Piester's explicit finding that:

> violence has carried over into the double cells where *tensions are increased by the limited cell size, noise, lack of privacy, restricted surveillance of the inmates confined therein,* deterrents to the reporting of assaults and other violations of prison rules by a cellmate, *suspicions about the presence of contraband,* and the large amount of time spent confined on a lockdown status with a cellmate. The amount of violence and threatened violence as well

as the presence of the factors that fuel them are sufficient to conclude that a pervasive risk of harm exists in the four main housing units, a risk of such magnitude as to put defendants on notice of its existence.

*Jensen,* 807 F.Supp. at 1483 (emphasis added).

A similar point should be made with regard to Judge Piester's findings concerning "other, long-term inmates." While Judge Piester found that NSP was not reasonably responding to the pervasive risk of harm because it was randomly placing newly arrived inmates in double cells, *Jensen,* 807 F.Supp. at 1483, he also found with regard to "long-term" inmates that there was "no evidence that the compatibility of these inmates is not being at least informally considered on the basis of experience." *Id.* at 1484.

It is clear, nevertheless, that there is a close interrelationship, both factually and legally, between "long-term" inmates and "newly arrived" inmates. Indeed, Judge Piester found that the pervasive risk of harm existed throughout "the four main housing units," and he did not limit his findings only to "newly arrived" inmates. *Id.* at 1483.

It would have been nearly impossible to separate the question of "newly arrived" inmates from that of "long-term" inmates for purposes of the Eighth Amendment claim in these cases because not only are long-term inmates at NSP double-celled with other long-term inmates, but long-term inmates are also double-celled with newly arrived inmates. Consider, for example, the testimony regarding inmate Jensen (a newly arrived inmate) being placed with inmate Svitak (a long-term inmate) and the resulting assault on Jensen by Svitak. *Id.* at 1473.

Notwithstanding Judge Piester's findings regarding "long-term" inmates, for all practical purposes, counsel for the plaintiffs could not have segregated their work between "long-term" and "newly arrived" inmates in any meaningful manner.

### d.

With regard to "incomplete" success on the related claims, while I find that a 15–percent reduction in the lodestar is justified for incomplete success, I do not agree that the

plaintiffs should be penalized to any greater degree for such lack of success.

Three things support a reduction in the lodestar for incomplete success: (1) the plaintiffs obtained no remedy on the contraband claim; (2) the plaintiffs obtained no remedy on the first component of their Eighth Amendment claim regarding such things as noise; and (3) the plaintiffs' success on the Eighth Amendment violation was limited to the random double-celling of "newly arrived," as opposed to veteran, inmates. Thus, it is clear that the plaintiffs were not completely successful.[14]

It should be recognized, however, that Judge Piester considered the suspicions generated by the rule on contraband to have exacerbated the problem of violence in the double cells, which in turn partially contributed to his recommendation for injunctive relief regarding random double-celling of newly arrived inmates. The same is true regarding the Eighth Amendment claims respecting such things as the level of noise in the double cells. As Judge Piester explicitly recognized, proof of violence throughout the NSP housing units was not limited only to "newly arrived" inmates.

Therefore, although the plaintiffs were not successful on these points, the proof adduced regarding them contributed toward proof of an Eighth Amendment violation respecting random double-celling of newly arrived inmates. Consequently, it would be wrong to conclude that these arguments did not play an important part in the success the plaintiffs enjoyed.

Still further, it must be observed that the plaintiffs prevailed on a major portion of the Eighth Amendment claim described by Judge Cambridge as their "main claim." They obtained injunctive relief with respect to random double-celling of newly arrived inmates. This is very significant relief insofar as "newly arrived" inmates are concerned because it goes far toward protecting them from the chilling violence found to pervade the double cells at NSP.

Moreover, the relief obtained regarding "newly arrived" inmates also benefits "long-term" inmates in two ways. First, any placement of a "newly arrived" inmate will invoke the protective provisions of the injunction, and this should in turn make for a safer prison generally. To the extent that the level of violence is reduced regarding newly arrived inmates, the total level of violence in the housing units, which impacts all prisoners, is reduced accordingly, and the "veterans" will benefit since the prison will generally be a safer place for everyone.

Secondly, if a "newly arrived" inmate is placed with a "long-term" inmate, both inmates will benefit from the formal procedures outlined in the injunction. The injunction specifically requires NSP officials to examine the likelihood of violence on the part of *both* men [15] if they are to be celled together. Thus, while the injunctive relief is directed at newly arrived inmates, the benefits are not enjoyed exclusively by that group.

The major goal of these cases was to remedy the violence that prevailed in the double cells at NSP. The plaintiffs have obtained injunctive relief that is directly responsive to this goal. While calculations of this kind are necessarily subjective and defy objective quantification, I believe it is fair to conclude that the plaintiffs successfully achieved about 85 percent of their goals with regard to these related claims.

In summary, "[t]he result is what matters." *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. The plaintiffs in these cases succeeded on a major portion of their "main" Eighth Amendment claim regarding "newly arrived"

14. The fact that the plaintiffs did not prevail on their damage claims is not of any significance for purposes of attorney fees. Magistrate Judge Piester declined to award damages in these cases because the defendants had qualified immunity and Eleventh Amendment immunity. There is not the slightest indication that damages might not otherwise have been awarded but for the existence of these immunity principles. Thus, the plaintiffs should not be penalized for incom-plete success due to lack of a damage award as the defendants did not escape damages on the merits.

15. The injunctive relief requires NSP officials to examine various information regarding not only the newly arrived inmates, but also the inmates "with whom the new commitments are to be housed." (Filing 244, at 27.)

inmates. Still further, the remedy they obtained will benefit "veteran" inmates. Finally, the failure to achieve success on the Fourteenth Amendment contraband claim and the first component of the Eighth Amendment claim regarding noise and the like is not especially significant. Those claims were clearly subsidiary claims and, in any event, the proof presented concerning those claims contributed to the plaintiffs' success on their "main" claim. Accordingly, while a modest 15–percent reduction in the lodestar is justified because the plaintiffs were not entirely successful, no additional reduction is appropriate.

### 9.

I have therefore determined to award counsel for the plaintiffs the sum of $168,-543.27 (85 percent of the lodestar of $198,-286.20). This will provide weighted effective hourly rates of approximately $72.21 for all timekeepers, $81.43 for all lawyers, $34.03 for all law clerks, and $33.39 for all legal assistants.

This award means that the law firm of Harding & Ogborn will recover $100,467.28, as follows: (1) lawyers will be compensated at an effective hourly rate of $89.25; (2) law clerks will be compensated at an effective hourly rate of $38.25; and (3) legal assistants will be compensated at an effective hourly rate of $46.75.

This award means that Robert Shively's law firm will recover $33,797.32, as follows: (1) lawyers will be compensated at an effective hourly rate of $72.25; (2) law clerks will be compensated at an effective hourly rate of $21.25; and (3) legal assistants will be compensated at an effective hourly rate of $34.00.

This award means that Barry Hemmerling's law firm will recover $19,935.60, as follows: (1) lawyers will be compensated at an effective hourly rate of $72.25; (2) law clerks will be compensated at an effective hourly rate of $34.00; and (3) legal assistants will be compensated at an effective hourly rate of $25.50.

This award means that Scott Freese's law firm will recover $14,343.07, as follows: lawyers will be compensated at an effective hourly rate of $72.25.

### 10.

Finally, as a "check" on this award, I examined comparable cases to determine whether two facets of the award are reasonable. I examined the gross amount of the award in these cases compared to other prisoner civil-rights cases of fairly comparable size. I also examined the effective-hourly-rate award for a bench-tried case of comparable complexity in the District of Nebraska, using comparable lead counsel, wherein the fee award was scrutinized by the court of appeals and affirmed. Both comparisons satisfy me that the award I make here is reasonable.

First, I have examined what I believe are comparable prisoner civil-rights cases in the Eighth Circuit in terms of the gross award of fees. Admittedly, a comparison with other cases is difficult because prisoner civil-rights litigation involves unusual impediments such as qualified immunity from damage awards. Nevertheless, two roughly comparable cases support the award of attorney fees in this matter.

In *DeGidio v. Pung*, 920 F.2d 525 (8th Cir.1990), the United States Court of Appeals for the Eighth Circuit dealt with a lawsuit involving the Minnesota Correctional Facility at Stillwater, Minnesota. *DeGidio* was a class-action lawsuit brought under the provisions of 42 U.S.C. § 1983, alleging that the tuberculosis screening and control procedures at the correctional facility were inadequate and constituted cruel and unusual punishment in violation of the Eighth Amendment.

Following a nonjury trial, the district court found that the Eighth Amendment had been violated. However, the court denied injunctive relief because the Eighth Amendment violations were remedied during the course of the litigation. Nevertheless, finding that the lawsuit had spurred many of the remedial changes, the district court held that the plaintiffs were prevailing parties and ordered the defendants to pay $210,303 in attorney fees and costs. Noting that the district court had reduced the requested fees by 65 percent to account for limited success and incomplete

and deficient time records, the court of appeals affirmed. *Id.* at 533–34.

In *McDonald v. Armontrout*, 860 F.2d 1456 (8th Cir.1988), inmates under sentence of death at the Missouri State Penitentiary brought a class action under 42 U.S.C. § 1983, challenging their conditions of confinement. Shortly before the suit was to go to trial, the parties reached a settlement and signed a consent decree. The consent decree left the issue of attorney fees for resolution by the district court.

The district court ordered the defendant state officials to pay approximately $276,000 in attorney fees and expenses. In making the award, the court allowed $150 per hour for two lawyers, $100 per hour for another lawyer, and $85 per hour for various associates, compensating each attorney at only half that rate for each hour of travel time. The parties appealed.

The court of appeals affirmed, holding that: (1) the $150 hourly rate for both lead counsel was appropriate; (2) the fact that a private attorney's firm was located in a rural area did not necessitate a lower hourly rate; (3) the fact that the second attorney had more expertise in prisoner civil-rights cases did not necessitate a higher hourly rate; and (4) the reduction in the hourly rate for travel time was justified, although not required.

While neither *DeGidio* nor *McDonald* is perfectly analogous, they are sufficiently similar to serve as a test of what is obviously a significant award of fees in these cases. When *DeGidio* and *McDonald* are compared to these cases, and their fee awards compared to the fee award in these cases, it is fair to say that *DeGidio* and *McDonald* generally support the award I make here.

Next, I used the effective-hourly-rate awards in *Lutheran Medical Ctr.*, 814 F.Supp. at 805, as a comparison. As noted previously, while *Lutheran Medical Ctr.* involved different issues, it was a bench-tried case involving counsel of similar education and experience, and the level of complexity (notwithstanding the difference in issues and length of trial) was similar. That case was appealed to the United States Court of Appeals for the Eighth Circuit, and the court of appeals affirmed the award of attorney fees. 25 F.3d at 622–24.

In *Lutheran Medical Ctr.*, I awarded fees producing an effective hourly rate of about $69 for all timekeepers. 814 F.Supp. at 805. The effective hourly rate for all timekeepers in these cases is about $72. Likewise, in *Lutheran Medical Ctr.*, I awarded fees producing an effective hourly rate of about $82 for lawyers. *Id.* In these cases, I have awarded an effective hourly rate for lawyers of about $81. I am thus satisfied that the award I make in these cases is generally supported by the award I approved in *Lutheran Medical Ctr.*, which was affirmed on appeal.

### D.

I turn next to the examination of expenses.[16] In two submissions, one claiming costs of $9,388.60, (Filing 252), and the other claiming costs of $933.23, (Filing 259, Ex. A at 2, ¶ 4), counsel for the plaintiffs request reimbursement for out-of-pocket expenses totaling $10,321.83. I shall approve this amount as a component of the attorney fees award.

The defendants argue that some of the expenses are not properly documented and that some of them were unnecessary. I am not persuaded by the defendants' arguments.

While I agree that the plaintiffs' counsel could have done a better job of providing supporting details for some of the expenses, I am satisfied that I have enough information to make an intelligent evaluation of their claim. (*See, e.g.,* Filing 253, Barton Aff. ¶¶ 25–26.)

For example, I note that Mr. Barton has provided me with information regarding (1) the method used by counsel to incur expenses so as to provide justification for the expenses, and (2) how counsel constructed (or reconstructed) the records to verify whether an expense was incurred for these

---

**16.** To the extent that any of these expenses are also properly taxed as costs, the plaintiffs are not entitled to recover the expenses twice. Accordingly, counsel for the plaintiffs should take care to avoid any double recovery.

cases. (*Id.*) I also note that Mr. Barton swore under oath that his firm "voluntarily deducted over $2,850.00 in actual expenses" that would customarily have been billed to fee-paying clients. (*Id.*, ¶ 26.) This suggests that counsel exercised the appropriate "billing judgment" expected by the Supreme Court.

With regard to the issue of unnecessary expenses, I am satisfied that the expenses incurred in these cases were reasonably necessary. The defendants particularly, but not exclusively, challenge expenses associated with providing photocopies of pleadings and briefs to the inmate class. While I believe there might have been a better way to handle dissemination of information to the class, hindsight ought not to be used to evaluate the matter. The question is whether a reasonable attorney would have incurred the expenses at the time, and I cannot conclude that such expenses were unreasonable when viewed from that perspective.

After reviewing the submissions of counsel, I note that there is a discrepancy between the total amount of expenses claimed ($10,321.83) and the total expenses listed on the supporting documentation submitted by all four law firms. In their initial application for attorney fees, the plaintiffs' counsel claimed expenses of $9,388.60. (Filing 252, at 1). Counsel for the plaintiffs subsequently requested an additional $933.23. (Filing 259, Barton Supp. Aff. at 2, ¶ 4.)

However, when I totaled all the expenses listed on all the recapitulations, my addition revealed that total out-of-pocket expenses were actually $10,654.42. It thus appears that counsel "wrote off," perhaps inadvertently, expenses totaling $332.59. For purposes of an award against the defendants, I took the lower figure ($10,321.83) as the amount actually claimed because that is the amount requested in lead counsel's initial application and supplemental affidavit.

The expenses and fees awarded pursuant to this opinion shall be disbursed to the trust account of Harding & Ogborn and then paid to counsel as their interests may appear. I remind counsel that the federal practice fund must be reimbursed for any money advanced from it, and according to my calculations, the expense figure of $10,321.83 includes a $1,000 disbursement from the fund. It appears that Harding & Ogborn should receive 67.81 percent of any expenses awarded as a component of attorney fees; Robert Shively should receive 3.30 percent of any expenses awarded as a component of attorney fees; Barry Hemmerling should receive 14.42 percent of any expenses awarded as a component of attorney fees (said percentage including $1,000 advanced from the federal practice fund); and Scott Freese should receive 14.47 percent of any expenses awarded as a component of attorney fees. The court retains jurisdiction to resolve any disputes about the appropriate reimbursement of expenses among the plaintiffs' counsel or between the plaintiffs' counsel and the federal practice fund.

## E.

To summarize, I find and conclude that:

(1) The plaintiffs are prevailing parties and there is no reason not to award attorney fees;

(2) Using the lodestar method, the plaintiffs would be entitled to recover attorney fees of $198,286.20 (plus expenses), which award takes into account a 10–percent reduction in allowable hours due to incomplete documentation and duplicative effort;

(3) The lodestar should be calculated at current market rates to take into account the time value of money lost as a result of delay in payment, as well as other factors, and the lodestar should be calculated at $105 per hour for lead counsel (and his firm) and $85 per hour for all other counsel;

(4) The lodestar should not be enhanced for exceptional service or excellent results as the market rates employed in calculating the lodestar adequately compensate counsel for the service provided and the results obtained;

(5) There should be no reduction in the lodestar for "partial success" as the plaintiffs' claims were all related and it would have been impossible to prosecute the successful claim without presenting evidence on the unsuccessful claims;

(6) There should be a reduction of 15 percent in the lodestar for "incomplete success" on the related claims because (a) the plaintiffs obtained no remedy on the contraband claim; (b) the plaintiffs obtained no remedy on the first component of the Eighth Amendment claim regarding such things as noise, (c) the Eighth Amendment violation was limited to random "double-celling" of "newly arrived," as opposed to veteran, inmates;

(7) There should be no greater reduction in the lodestar for "incomplete success" because (a) the plaintiffs succeeded on a major portion of their "main" Eighth Amendment claim; (b) the remedy the plaintiffs obtained, although not specifically directed at "veteran" inmates, will benefit "veteran" inmates; and (c) the claims upon which the plaintiffs did not prevail were subsidiary; nevertheless, the proof presented on those claims contributed to the plaintiffs' success on their "main" claim;

(8) The plaintiffs are entitled to an attorney-fee award of $168,543.27 (85 percent of the lodestar); this award will provide a weighted effective hourly rate of approximately $72.21 for all timekeepers, $81.43 for all lawyers, $34.03 for all law clerks, and $33.39 for all legal assistants; and

(9) The plaintiffs are additionally entitled to reimbursement for out-of-pocket expenses totaling $10,321.83.

IT IS ORDERED that:

(1) The defendants' motions (Filing 255 in No. CV87–L–377; Filing 272 in No. CV87–L–476; Filing 272 in No. CV87–L–497; Filing 279 in No. CV87–L–607) requesting the court to revoke its prior order are denied;

(2) The plaintiffs' motions (Filing 252 in No. CV87–L–377; Filing 268 in No. CV87–L–476; Filing 269 in No. CV87–L–497; Filing 276 in No. CV87–L–607) requesting an award of attorney fees and expenses are granted in part and denied in part, and the plaintiffs are awarded $168,543.27 in fees, plus expenses of $10,321.83, for a total attorney-fee award of $178,865.10;

(3) Final judgment shall be entered by separate document contemporaneously with the filing of this memorandum and order.

**JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 54(a) and Federal Rule of Civil Procedure 58,

FINAL JUDGMENT IN THESE CASES IS ENTERED as follows:

(1) For the defendants and against the plaintiffs, providing that the plaintiffs shall take nothing except as provided in the following portions of this judgment;

(2) For the plaintiffs and against defendants Hopkins and Clarke, in their official capacities, for failure to protect the plaintiffs from the threat of violent attack by a cellmate in violation of the Eighth Amendment to the Constitution;

(3) Pursuant to Federal Rule of Civil Procedure 65(d), defendants Harold Clarke and Frank Hopkins, in their official capacities, jointly and severally, their successors, and their officers, agents, servants, and employees are permanently enjoined to immediately adopt, implement, follow, and enforce the remedial plan as more specifically provided in the following paragraphs:

a. Said parties shall cause to be adopted, and continually thereafter implemented, followed, and enforced, a revision to the operating procedures of the Nebraska State Penitentiary, part IV(A) of Operational Memorandum 201.002.102, entitled "Initial Classification," as set forth in the following paragraph;

b. The operating procedure shall provide in substance the following:

IV. *Procedures*

A. "Initial" Classification System

1. Prior to Initial Classification conducted at the NSP, the chairperson or designee of the Initial Classification Committee will meet with the Unit Managers of designees of Housing Units # 1, 2, 3, 4, and 5 and a case manager from the medium security unit. At said meeting, the classification study, initial classification rating instrument, initial classification action form, and institutional files of the inmates being received at the NSP and the inmates with whom the

new commitments are to be housed or bunked, will be reviewed.

a. Classification Study

Items in the Classification Study that will be reviewed and considered include, but are not limited to:

● A summary of the inmate's criminal history

● Inmate's social history

● Inmate's medical history and current medical health

● Psychological profile

● Staff reports and recommendations

b. Initial Classification Rating Instrument

Items on the Initial Classification Rating Instrument that will be reviewed and considered include, but are not limited to:

● Current detainers

● Current offenses

● Escapes or attempted escapes

● Past violence (past violence that occurred outside of a correctional setting)

● Projected length of incarceration

● Central Monitoring

c. Initial Classification Action Form

Items on the Initial Classification Action Form that will be reviewed and considered include, but are not limited to:

● Inmate's personal risk factors which include:

–suicide attempts/gestures

–violence towards other inmates

–violence towards staff

–victim potential

–escape/security risk

● Personal adjustment factors, which include:

–general hostility

–need for mental health program intervention

–DEC team concerns about overall adjustment

–Need for special assignment

d. Institutional Files

Items in the Institutional File that will be reviewed and considered include, but are not limited to:

● admission summary

● presentence investigation report (when available)

● classification report and recommendations

● progress reports and admission-orientation reports

● reports of any disciplinary infractions and of their disposition

● other pertinent data concerning background, conduct, associations, and family relationships

Based on the above-noted review, said staff will determine the most appropriate housing location for the new commitments, and then complete the form entitled "Initial Classification Assignment of Living Location." (Attachment A). The words "most appropriate housing location for the new commitments" shall mean a housing placement, as of the time the cell assignment is made, that provides each cellmate with reasonable safety from assault, taking into consideration all data then reasonably available to the decision makers regarding each proposed cellmate (whether or not a proposed cellmate is a new commitment). Reasonable safety is not a guarantee of absolute safety, and the words "most appropriate housing location for the new commitments" shall not be understood to require a guarantee of absolute safety. The decision makers may consider other valid goals in making cell assignments so long as the cell assignment provides each cellmate with reasonable safety from assault. If a decision is made to assign more than one person to a cell, the persons making such an assignment shall state in writing why, at the time of the cell assignment, the cell assignment provides each cellmate with reasonable safety from assault. The statement of reasons may be a short and concise summary of the reasons for the conclusion that the cell assignment provides each inmate with reasonable safety from assault. Such a statement of reasons shall

be made on the form entitled "Initial Classification Assignment of Living Location" (Attachment A), and the decision shall be recorded under the heading "Comments" for "New Commitment" and for "NSP Cellmate."

2. The Initial Classification Committee is a two-person, programming committee which meets every Wednesday to assign new inmates to jobs and housing locations. The initial assignment of an inmate's housing location is made pursuant to the procedure noted in paragraph IV(A)(1) above. The initial assignment of jobs is based on institutional needs.

c. The form entitled "Initial Classification Assignment of Living Location," referred to as Attachment A to the operating procedure, shall provide in substance the following:

INITIAL CLASSIFICATION
ASSIGNMENT OF LIVING LOCATION

Date: _____

| NEW COMMITMENT | / | NSP CELLMATE |
|---|---|---|
| | / | |
| NAME/NUMBER | / | NAME/NUMBER |
| | / | |
| CELL ASSIGNMENT | / | CURRENT CELL ASSIGNMENT |
| ASSAULTIVE HISTORY: VERBAL OR PHYSICAL ASSAULTS— | / | ASSAULTIVE HISTORY: VERBAL OR PHYSICAL ASSAULTS— |
| LOCATION OF ASSAULTS— | / | LOCATION OF ASSAULTS— |
| INJURIES SUSTAINED/ INFLICTED | / | INJURIES SUSTAINED/ INFLICTED— |
| COMMENTS: | / | COMMENTS: |
| INITIAL CLASSIFICATION MANAGER DATE | / | UNIT MANAGER DATE |

DISTR: Records—(Each Inmate)
 Treatment File—(Each Inmate)

(4) Pursuant to Federal Rule of Civil Procedure 65(d), defendants Harold Clarke and Frank Hopkins, in their official capacities, jointly and severally, and their successors are permanently enjoined to immediately cause a copy of this injunction to be served upon all persons who shall have the delegated responsibility to make cell assignments involving newly arrived inmates at the Nebraska State Penitentiary, and, when so served, such persons shall be bound by the injunction in their official capacities as if specifically named therein;

(5) The court retains jurisdiction to enforce, modify, or rescind the provisions of the aforementioned injunction;

(6) Pursuant to 42 U.S.C. § 1988, the plaintiffs are awarded attorney fees of $178,-865.10, to be paid by defendants Clarke and Hopkins, in their official capacities, to the Clerk of the United States District Court for the District of Nebraska, and upon said payment to the Clerk, this portion of the judgment shall be satisfied insofar as the defendants are concerned;

(7) When the portion of the judgment regarding the attorney-fee award is paid to the Clerk of the United States District Court for the District of Nebraska by the defendants, the Clerk shall distribute said sum to the trust account of the law firm of Harding & Ogborn for distribution to counsel for the plaintiffs in accordance with the memorandum and order on attorney fees issued in this case;

(8) The court retains jurisdiction to resolve disputes among counsel for the plaintiffs or disputes between counsel for the plaintiffs and the federal practice fund regarding the attorney-fee award and its distribution.